**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Eugene PETERSON and Donald M. Peterson, Defendants-Appellants.**

**No. 73–1748.**

United States Courts of Appeals, Fifth Circuit.

Jan. 18, 1974.

Rehearing Denied Feb. 19 and March 29, 1974.

---

Phil Burleson, James L. Mitchell, Dallas, Tex., Glynn A. Pugh, Guanajuato, Gto., Mexico, for defendants-appellants.

Frank D. McCown, U. S. Atty., Fort Worth, Tex., Charles D. Cabaniss, Charles R. Parrett, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.

GEWIN, Circuit Judge:

This appeal is taken from a judgment of conviction entered against Dr. Donald Peterson for conspiring to defraud an agency of the United States Government, in violation of 18 U.S.C. § 371 (1970).[1] His brother and alleged co-conspirator, James E. Peterson, also before us on appeal, was convicted under the conspiracy charge and on a number of counts under 18 U.S.C. § 1001 (1970)[2] alleging the substantive offens-

---

1. 18 U.S.C. § 371 (1970):
   "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
   "If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

2. 18 U.S.C. § 1001 (1970):
   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or documents knowing the same to contain any false, fictitious or fraudulent statement or

es of unlawfully and knowingly making false statements of material facts to a government agency. They were tried jointly before a jury which found them guilty. The prevarication is designated as the allegedly false certification that physical therapy rendered to patients at an extended care facility was provided by Dr. Peterson or under his personal auspices. Both appellants claim that numerous evidentiary errors were committed below and challenge the sufficiency of the evidence to support the jury's verdict. Finding these contentions to be of only limited efficacy, we reverse the conspiracy convictions but affirm James E. Peterson's conviction of the substantive offenses.

I

Before addressing the issues raised on appeal, it is instructive to consider the complicated statutory and factual background which gave rise to the instant prosecutions. James E. Peterson is the owner of Concord Manor, a nursing home approved by the Social Security Administration as an extended care facility and hence qualified to receive payment for hospital benefits rendered to the aged under Title XVIII, Health Insurance for the Aged of the Social Security Act, popularly denominated the Medicare Act.[3] The Act prescribes a bifurcated scheme of remuneration to those extending aid to the elderly. Under Part A, an extended care facility making outlays for room and board and nursing services may be compensated on a per diem rate determined by agreement with its fiscal intermediary, here Mutual of Omaha.[4] Under Part B, doctors rendering physical therapy are remunerated directly by a second fiscal intermediary, here the Group Medical and Surgical Service (Blue Cross-Blue Shield). Prior to July 1, 1968, Part B claims were required to be filed by a physician on government Form SSA–1490D(2), and could not be filed by a nursing home or medical organization comprised of physical therapists.[5] The 1968 amendment, however, altered this filing and compensation procedure by enabling a group of therapists, who form an organization to provide physical therapy and enter into agreements with extended care facilities to render the therapy prescribed by a patient's doctor, to bill directly for their services. It was this amendment which spurred the organization of Zodiac, Inc. by James Peterson and the fraternal interplay between James and Dr. Peterson. At his brother's behest Dr. Peterson enlisted as medical advisor to Zodiac, responsible for drafting procedures which would enable it to qualify as a "provider of services." Upon such qualification, Zodiac would be entitled, under the new amendment, to bill directly for costs incurred in administering physical therapy to Medicare patients.

We turn now to the occurrences which gave rise to the institution of criminal proceedings against the two defendants. During the first six months of 1968, Zodiac furnished physical therapy to pa-

entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The meaning of this statute is at issue in United States v. Lambert, 470 F.2d 354 (5th Cir. 1972), rehearing en banc granted April 17, 1973.

3. 42 U.S.C. § 1395 et seq. (1970).

4. Each provider of services under the Act has a fiscal intermediary who is responsible for insuring the integrity of the program and paying the bills for services rendered by the provider to Medicare beneficiaries.

5. The only way in which Concord Manor could recoup the expenses incurred would be

under the Part A cost per diem agreed to by Concord and its fiscal intermediary. During the period in which the alleged felonious conduct took place, Concord's per diem rate was $12. The Government claims the filing scheme devised herein was fashioned in order to circumvent the limitations on returns for services rendered under Part A. Under Part B, the claimant could obtain full remuneration for physical therapy. Thus, the remittance by Dr. Peterson of claims for payments enabled Concord Manor to procure greater compensation. Dr. Peterson professed ignorance of the differences in filing under Parts A & B.

tients at Concord Manor. This therapy was administered by a registered physical therapist and two therapy aides. Dr. Peterson's involvement was purportedly confined to drafting procedures for submission to the Social Security agency, pursuant to the new amendment. Nevertheless, in 1969, Group Medical and Surgical Service received requests under his name for payment of medical insurance benefits for Zodiac patients receiving physical therapy from January to June 1968. These requests were submitted on Form SSA–1490D(2), alluded to above, which in box # 14, required that the administering doctor, here Dr. Peterson, certify that he either supplied the services or had them provided under his personal direction.[6] The forms received contained Dr. Peterson's signature, subsequently learned to have been forged, his personal supplier number, and a post office box address substituted for Dr. Peterson's registered address. The change of address was intended to divert the checks from Dr. Peterson's address to that of Zodiac. This was an abortive effort because Dr. Peterson's supplier number and address were unique to him and payment would be sent to Dr. Peterson automatically notwithstanding the change of address. Ignorant of the forgery and disregarding, as required, the substituted address, Group Medical and Surgical Service remitted claims payments to Dr. Peterson, who after depositing them in his Dallas Clinic Account, upon the same day he received them, drew a new check for the same amount payable to the order of Zodiac. Both convictions stem from the conduct engaged in with respect to the filing of the claims.

## II

The fraternal bond, welded by the joint employment of Dr. James Peterson in the Zodiac endeavors, appears to have been dissipated by the advancement of divergent theories for upsetting their convictions. The only semblance of unity retained throughout this appeal is that both claim that the prosecutors and the jury made "much ado about nothing." The premise underlying James Peterson's claim is that his brother was sufficiently involved in the operations of Zodiac affairs to dispel any inference that he, James Peterson, perpetrated a fraud in filing the claims. Conversely, the premise underlying Dr. Peterson's claim is that the evidence of his involvement in Zodiac affairs and the filing of claims is so meagre that he could not be found to have participated in the conspiracy. We consider their precise contentions advanced seriatim.

James Peterson raises four contentions on appeal, each of which is devoid of merit. The first is that the lower court erred in excluding certain documents relating to Zodiac's qualification as a provider of services and two prior indictments which were dismissed. Second, the government's suppression of a letter from HEW addressed to Zodiac warranted reversal under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). And third, the lower court erred in failing to give requested charges and instructions which would have clarified the meaning of the phrase "under his personal direction." Each of these contentions fails, the first because under F.R.Cr.Proc. 26, it was within the district court's discretion to exclude the proffered evidence and such discretion was not abused in the instant case, see United States v. Twilligear, 460 F.2d 79, 81 (10th Cir. 1972); United States v. Skillman, 442 F.2d 542, 551 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971), the second, because James Peterson's characterization of the government's action with respect to the HEW letter as suppression is illusory, and the third, because the trial judge's instructions encom-

---

6. The full text of box 14 contained on the claim filed with group Medical and Surgical Service is as follows:

"Signature of physician or supplier (a physician's signature certified that physician's services were personally rendered by him or under his personal direction."

passed the substance of what James Peterson desired to have the court propound to the jury. A more formidable impediment to the efficacy of these evidentiary arguments is that the excluded evidence would be germane only if the theory upon which his defense is predicated were viable. This theory is that the meaning of the terminology "under his personal direction" contained in box 14 of Form SSA–1490D(2) was ambiguous and hence any misrepresentation in filing the claims for payment was attributable to inadvertence and not to willfulness. The excluded evidence arguably gave credence to the view that some ambiguity prevailed.[7] However, whatever force his theory has derives largely from its generality, for the overwhelming evidence established that Dr. Peterson did not in fact supervise the administering of physical therapy to any particular Zodiac patients. The inefficacy of his theory invariably condemns James Peterson's fourth challenge, raised below through a motion for judgment of acquittal, and pressed here that the evidence was insufficient to support the jury's finding that he had made willful misrepresentations on the claim forms filed with Group Medical and Surgical Service. Evidence of Dr. Peterson's non-involvement in administering physical therapy clearly supports the jury's finding in this regard. Thus, James Peterson's conviction on the substantive counts must stand.

Dr. Peterson objects on appeal to two evidentiary rulings [8] and the sufficiency of the evidence to support the jury's finding that he participated in a conspiracy to defraud the government. He had raised this sufficiency objection in the district court by means of a motion for judgment of acquittal when the government rested its case, again when James Peterson rested his defense and reiterated it when all parties had closed their testimony by way of an objection to the submission of the case under the district court's charge. We confine our resolution to the sufficiency grounds.

Under established judicial precedent, a jury verdict must be sustained if there is substantial evidence when viewed in a light most propitious to the government, to support it. *See* Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Hernandez, 484 F.2d 86, 87 (5th Cir. 1973); United States v. Arroyave, 477 F.2d 157, 163 (5th Cir. 1973); Lacaze v. United States, 391 F.2d 516, 519 (5th Cir. 1968). This rule, while dictating that deference be extended to jury findings, does not immunize them from attack. An examination of the evidence convinces us that Dr. Peterson's challenge is well-founded.

In reviewing the evidence marshalled by the government in support of the conspiracy charge, it is critical to note that conduct of Dr. Peterson subsequent to the time that claims were filed with Group Medical and Surgical Service is germane only to the extent that such conduct supports the inference that he had planned with James Peterson to file the claims containing the misrepresentation. Since the conspiracy had run its course *eo instante* upon the filing of these claims, Dr. Peterson's conduct

---

7. The excluded evidence tended to show that confusion existed as to whether a physician had to be physically present for physical therapy to be administered under his personal supervision or whether it sufficed if he gave written instructions concerning the proper therapy to be given a particular patient. The dubious inferences drawn by James Peterson from the excluded indictments and the purportedly suppressed HEW letter were claimed to buttress his view concerning the ambiguity in standards.

8. Dr. Peterson objected to the exclusion of evidence that prior to indictment he had initiated a civil suit against HEW to recover Medicare payments withheld from him. He claimed that the instant indictment was procured in retaliation to the civil suit. He also claimed that evidence that Concord's fiscal intermediary suspended payments because of Concord's failure to file annual cost reports as required under Part A was irrelevant as to him and that its admission "probably" influenced the jury in its consideration of his guilt under the conspiracy count.

upon receipt of checks in payment of claims could not constitute an overt act in its furtherance.[9] *See* Bollenbach v. United States, 326 U.S. 607, 611, 66 S. Ct. 402, 404, 90 L.Ed. 350, 353 (1946).

■ The record is devoid of evidence, prior to Dr. Peterson's receipt of claims checks from Group Medical, which supports the conclusion that he had engaged in the alleged conspiracy.[10] Dr. Peterson steadfastly adhered to the position that he never directed the administering of physical therapy to Medicare patients and that he was ignorant of the forgery of his signature on Form SSA-1490D(2). His testimony was corroborated by Helen Maeker, the registered physical therapist, and Lucille Morton, the secretary who at James Peterson's behest, forged Dr. Peterson's signature and attempted to substitute a post office box number for Dr. Peterson's registered address listed on the claims form.[11] Moreover, it is uncontroverted that Dr. Peterson expressly disavowed any intention to bill for services performed by Zodiac during his abbreviated affiliation and that he severed relations with Zodiac after July 1, 1968, a substantial period of time before March 1, 1969, the date the alleged conspiracy transpired.

Finally, there is no evidence that he saw, much less conversed with James Peterson after his disaffiliation, other than upon the day the claims checks were remitted to him. Hence, the jury verdict can only be sustained if Dr. Peterson's conduct upon receiving the checks supports the inference that he had preordained the false filing engineered by James Peterson.

The evidence adduced by the government at trial established that upon receipt of payment checks from Group Medical totaling $18,000, Dr. Peterson reported their arrival to his brother, deposited them in his clinic account, personally wrote a new check designated accounts payable to Zodiac for the entire amount and delivered it to Zodiac on the very same day.[12] Dr. Peterson admitted that he took this action without making any attempt to contact Group Medical and Surgical Service about the checks and despite the fact that he knew the claims did not involve any of his own patients and that he had not authorized submission of the claims in his own name. The government also attributed significance to testimony elicited on cross-examination of Dr. Peterson which in allegedly impugning his credibility,

9. An examination of the indictment, the evidence and the position taken by the government at trial and on appeal clearly demonstrates that the essential basis of the charges was not that the appellants defrauded the Government out of money but rather that they made false statements to a government agency which impeded the functioning of that agency. Representative of the Government's position is the opening statement of its attorney at trial:

"Now count 40 is a conspiracy count. What the Government would show, as far as conspiracy is concerned, is not that they were out to defraud the Government. We are not claiming that there was, it was conspiracy to defraud the Government but not for money."

10. The grand jury charges alleged that nine overt acts were committed in furtherance of the conspiracy. The first overt act was James Peterson's application for a post office box in the name of Concord Manor, the next 5 pertained to Dr. Peterson's alleged action in causing the Form SSA-

1490D(2) to be mailed, and the last 3 consisted of the sequence of events transpiring subsequent to Dr. Peterson's receipt of the claims.

11. As previously indicated in the body of this opinion, under the Part B program computerized by Group Medical and Surgical Service, each provider of services is furnished with a provider number, unique to the supplier of services, which is used on all requests for payment. The supplier also registers an address with the fiscal intermediary to which all claims payments are remitted. The registered address and supplier number serve as controls against disruption of the proper administration of payments made by the fiscal intermediary.

12. Dr. Peterson explained the accounts payable designation on the check as purely a bookkeeping notation which would indicate receipts and disbursement of funds of equal amounts resulting in no gain to him. Dr. Peterson's treatment of the payment to Zodiac as a business deduction on his tax form was approved by the IRS.

reflected upon the mendacity of his assertions of noninvolvement in the claims filed.[13]

The countervailing evidence and that which compels the conclusion that the jury's inference of conspiracy must be set aside revolves around the actions of the alleged confederate, James Peterson. His conduct, in forging his brother's signature, in supplying his supplier number, and in altering his registered address on the claims filed with Group Medical reflects a protracted effort to divert the checks from Dr. Peterson. Such an effort would appear to be inexplicable if Dr. Peterson were involved in the scheme. In short, Dr. Peterson's conduct appears to be more pickwickian than conspiratorial.

Moreover, we cannot overlook the fact that Dr. Peterson was exonerated of the charges contained in the 39 substantive counts of the indictment. Concededly, a conspiracy to commit a crime is a separate and distinct crime from the substantive offense. *See* Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312, 317 rehearing denied, 365 U.S. 825, 81 S.Ct. 687, 5 L.Ed. 2d 703 (1961); United States v. Jasso, 442 F.2d 1054, 1056 (5th Cir.), cert. denied, 404 U.S. 845, 92 S.Ct. 146, 30 L. Ed.2d 81 (1971); Downing v. United States, 348 F.2d 594, 600 (5th Cir.), cert. denied, 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965). But this distinction may become tenuous where, after receiving an "aiding or abetting" charge, a jury exonerates a defendant on the substantive count the elements of which closely approximate, if not parallel, the overt acts alleged in the conspiracy charge. We do not mean to suggest that were additional evidence of conspiracy adduced at trial a jury verdict of guilty on the conspiracy count alone would invariably require reversal. Rather, based on the unique facts presented in the record, it is difficult to conceive of how the jury could exculpate Dr. Peterson as an aider or abettor but yet inculpate him as a confederate.

### III

For the aforementioned reasons, we hold that the jury lacked sufficient evidence to find Dr. Peterson guilty of conspiracy to defraud an agency of the United States Government. Concomitantly, since this absolution removes James Peterson's confederate, his conviction on the conspiracy charge must also be reversed. Since neither appellant joined a motion for a new trial with their motions for judgment of acquittal, the appropriate disposition is to reverse and remand with directions that the indictments be dismissed as to the conspiracy counts.[14] *See* United States v. Apollo, 476 F.2d 156, 158 n. 1 (5th Cir. 1973); United States v. Musquiz, 445 F.2d 963, 966 (5th Cir. 1971); 2

13. The source for the impeaching testimony was a deposition given by Dr. Peterson in the civil suit he filed against HEW and a letter to a program integrity specialist of HEW. In the deposition Dr. Peterson responded that he was "acquainted" with Zodiac Enterprises but "did not know" what it was. In the letter Dr. Peterson explained that he billed for services in order to pay the salaries of therapists. Although these responses lack the lucidity which characterize his denial of involvement, they are not as conclusive of Dr. Peterson's credibility as the Government would have us believe. Dr. Peterson's responses in the deposition are so patently inconsistent that they could hardly be attributed to anything other than his misunderstanding of the question propounded. With respect to the letter, Dr. Peterson also maintained that he was uncertain whether he told the integrity specialist that he had billed for services, thereby suggesting that there was a difference between the claims for salaries he admittedly filed and the claims for services which were the object of the instant proceedings. That the letter referred to different claims belies the impeaching force ascribed to it by the government.

14. Even if the record disclosed a motion for a new trial our conclusion would not be altered. The record convinces us that the Government has been given a full and fair opportunity to present all the evidence available on the conspiracy charge. The facts have been fully developed and no useful purpose would be served by another conspiracy trial.

Wright, Federal Practice & Procedure § 470 (Supp.1973). Since we discern no infirmity in James Peterson's conviction on the substantive counts, we affirm as to that part of the judgment of conviction.

Affirmed in part; reversed and remanded with instructions to dismiss the conspiracy count of the indictment.