**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Albert John PENA, Defendant-Appellant.**

**No. 75–1608.**

United States Court of Appeals, Fifth Circuit.

March 3, 1976.

---

Philip S. Greene, Houston, Tex., Gerald M. Birnberg, Bellaire, Tex., for defendant-appellant.

Edward B. McDonough, Jr., U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before WISDOM, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

Albert John Pena was convicted by a jury on a three-count indictment charging distribution of heroin, possession with intent to distribute heroin and conspiracy to distribute heroin. 21 U.S.C. §§ 841(a)(1), 846. He received an 8-year sentence on Count I (distribution). Imposition of sentence on Counts II and III (possession and conspiracy) was suspended. In this direct appeal, Pena raises four issues for review, claiming that: (1) testimony concerning a statement made by a confidential informant was improperly excluded; (2) the delay preceding trial and retrial violated the local plan of the Southern District of Texas and the Sixth Amendment; (3) the evidence was insufficient to sustain a conviction on the conspiracy count; and (4) the charge to the jury was erroneous and insufficient. Finding merit with regard to issue (3) only, we reverse as to Count III (conspiracy) and affirm the conviction in all other respects.

The charges against Pena grew out of a heroin transaction alleged to have taken place at the New Manhattan Lounge in Houston, Texas, on July 16, 1971. Viewing the evidence in the light most favorable to the government, we can distill the following salient facts from testimony of Officer Legarreta, a special DEA undercover agent. Legarreta testified that early in the evening, he and John Rubio, a confidential informant, met with Pena and arranged for the defendant to supply them with two ounces of heroin. To secure the drug, Pena attempted to locate Vincente Vega. At one point, defendant left the lounge and returned with Ruben Rubio (no relation to John Rubio, the informant). The four men waited until Vega arrived, accompanied by Adan Garza. Vega told Legarreta that he did not have the heroin with him; he left shortly thereafter, allegedly to pick up the contraband. When Vega returned, he went directly to the men's restroom. Pena followed Vega, with Legarreta close behind both men. As he opened the bathroom door, Legarreta saw Vega place two packages on a shelf and leave the room. Pena took down the packages and handed them to Legarreta in exchange for a package containing $1200. It was later established that the packages handed to Legarreta by Pena contained heroin.

Pena's version of the incident is not totally dissimilar. The crucial difference is that Pena claims that he never handed the officer a package but merely took the money from Legarreta in his capacity as agent for John Rubio. According to the defendant, John Rubio mistakenly believed that Pena had killed his brother-in-law. To avenge this death, Rubio decided to frame Pena by requesting that the defendant receive some "reward" money from Legarreta and hold it for Rubio until he, Rubio, could find a safe place to store it. Pena claims he simply performed this task and delivered the money to Rubio, never aware that he was involved in an illegal drug transaction. In support of his defensive theory, Pena sought to introduce testimony establishing that in November of 1971 Rubio confessed his role in the "setup" after realizing that Pena was not responsible for his brother-in-law's death. Rubio did not testify at trial, having dropped

out of sight shortly after his alleged confession. The jury chose to reject Pena's defense and returned a guilty verdict on all counts. Vincente Vega, Pena's co-defendant, was found not guilty.

## I. TESTIMONY OF JESSE GARCIA

As his first assignment of error, Pena contends that the trial judge erroneously excluded a crucial portion of the testimony of defense witness Jesse Garcia, a mutual friend of Pena and Vega. On direct examination, Garcia testified that he spoke with the informant Rubio at a restaurant in November 1971. Defense counsel then asked Garcia to relate the substance of his conversation with Rubio as it related to Pena. The government objected on the basis that the informant's out-of-court declaration was hearsay. The court sustained the objection. For purposes of this appeal, defendant adduced the following testimony from Garcia outside the presence of the jury.

Q. Mr. Garcia, as a result of the conversation that you had, what, in effect, did Mr. John Rubio tell you with regard to Albert John Pena and this case?

A. Well, like I said, I ran into him in this restaurant and I asked him about Albert, how he was doing and all this, and he was drinking a beer and having something to eat there, and so was I, and—

Q. (interrupting) Speak up a little so we can hear you.

A. —this other friend of mine, you see, we had stopped by there to eat—I usually stop by there most of the time—and I asked him about Albert, and he told me that he had gotten even with Albert on account of he believed that Albert had killed his brother, or something like this.

Q. How did he get even with Albert?

A. He told me that he had set him up on selling something or other, and that Albert was supposed to pick up some money from some police officer, but that he didn't know

that the man that was going to turn him over some money was a police officer.

Q. Okay. And he told you that he had set Albert up?

A. Yes, sir.

Q. That he had, in fact, supplied the heroin that was sold—or, the substance that was sold, and that he got the money from Albert?

A. That—

Q. (interrupting) John Rubio had gotten the money back from Albert?

A. Well, he told me that he had gotten the money back from Albert, yes.

Q. All right.

Pena challenges the trial court's evidentiary ruling on three grounds. First, he claims that the statements are not hearsay but rather fall under the non-hearsay rubric of admissions of a party-opponent. Second, even if the statement is hearsay, Pena claims it is admissible as a declaration against penal interest. Third, Pena contends that the exclusion of Garcia's testimony deprived him of a fair trial and violated his due process rights as enunciated by the Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

While not unrelated, each contention requires separate treatment. It is undisputed that a party's out-of-court admission is admissible against him and is not generally considered to be hearsay. *See generally* C. McCormick, Evidence, § 262 at 628–631 (Cleary ed. 1972). In many instances, the statement of an agent of a party will likewise be admissible as a vicarious or representative admission of his principal. *See generally* C. McCormick, Evidence, § 267 at 639–47 (Cleary ed. 1972). The new Federal Rules of Evidence provide that "a statement is not hearsay if . . . the statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or . . . (D) a statement by his agent

or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2).

■ In this case, Pena argues that since Rubio was employed as a "special employee of the DEA," his statements should be imputed to the government. In other contexts, the government has been charged with the consequences of actions of informants who assist law enforcement officers in detecting crime, even though the informant is not a regular employee and is paid on a "cash and carry" basis. *See Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *United States v. Gomez-Rojas,* 507 F.2d 1213 (5th Cir. 1975) (entrapment). The court has not decided, however, whether such persons should be deemed agents of the United States for purposes of the rule as to vicarious admissions by a party-opponent. We do not reach that issue today. Even assuming for the sake of discussion that Rubio's status as an informant carried with it the power to make admissions on the government's behalf, the statements in question were made at a time when his relationship with the government had ceased. The prohibited transaction occurred in July; Rubio's conversation with Garcia was asserted to have taken place sometime in November. In the interim, Rubio apparently had no significant contacts with his "employers," with the exception of a single telephone call to an agent at the BNDD (DEA's predecessor). His November statement did not concern "a matter within the scope of his agency . . . made during the existence of the relationship" and thus may not be saved from its hearsay status by the rule on admissions.

■ Similarly, Pena is not aided by the analogy of the new federal evidence rule creating a hearsay exception for declarations against penal interest. The rule renders admissible any "statement which . . . so far tended to subject [the declarant] to . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." Fed.R.Evid. 804(b)(3). Assuming *arguendo* that this court might choose to be guided by the rule in a case which arose prior to its effective date, it is clear that Rubio's statements were not sufficiently self-incriminatory to fall within the ambit of the rule. The proffered testimony discloses only that Rubio admitted that he had gotten even with Pena by "setting him up" to be accused of selling something. There is no showing that Rubio falsified evidence; nor was it shown that Rubio involved Pena in a drug transaction without Pena's knowledge. Rubio could well have been discharging his proper role as an informant and at the same time intending to use his status to "get even" with one he believed had killed his brother-in-law. It is not a crime for an informant to assist narcotics agents in "setting up" or trapping a drug dealer if the means employed are lawful, even if his motives are not totally faithful to the government. Rubio's personal motives for helping the government "make this case" against Pena, while vengeful, do not tend to subject Rubio to criminal liability.

■ The statement attributed to Rubio to the effect that he got the money back from Pena is somewhat more troublesome. Pena suggests that the statement could form the basis for a federal prosecution against Rubio for embezzlement from the United States. Such a construction is not justified from the scanty tender shown by the record. The barebones statement is at best ambiguous. It does not purport to tell what Rubio did with the money once he received it from Pena. Without attempting to reconstruct the post-offense relationship of Pena and Rubio, we note that there are possible explanations of Rubio's receipt of money which are inconsistent with culpability on his part. For example, to complete his job as informant-participant, Rubio may have delivered the payment to the ultimate suppli-

er of the heroin or he may have returned it to Legarreta. In any event, the recount of Rubio's conversation with Garcia contained neither a confession nor a clear inculpatory remark which would exempt it from the normal rule against admitting hearsay testimony of an unavailable declarant.

■ Finally, we conclude that the exclusion of Garcia's testimony did not violate defendant's due process rights to a fair trial. In *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the United States Supreme Court recognized that a technical application of the exclusionary hearsay rules may contribute to denial of justice if the excluded evidence "bore persuasive assurances of trustworthiness" and was critical to the defendant's case. *Id.* at 302, 93 S.Ct. 1049. In examining the excluded confession in *Chambers,* the Court delineated several factors which are relevant to a determination of trustworthiness. When and to whom the statement is made is important, as is the presence or absence of corroborating evidence. Further, if the declarant is available to testify, there is less likelihood that the jury will attach undue weight to the evidence. Finally, whether the confession is "in a very real sense self-incriminatory and unquestionably against interest" is a significant indicator of reliability. *Id.* at 300–301, 93 S.Ct. at 1048.

The inquiry must necessarily be conducted on a case-by-case basis. The *Chambers* Court itself limited its holding to "the facts and circumstances of this case . . . ." *Id.* at 303, 93 S.Ct. at 1049. In this case, Pena argues that Garcia's testimony would have bolstered his claim that Rubio had "framed" him and retained the reward money as part of a scheme to deceive both the government and Pena. It is possible, of course, that the excluded testimony may have proven helpful to the defense, although we cannot tell from the limited proffer the extent to which Rubio's statements were consistent with Pena's defensive theory. But favorableness to the defense

is not the decisive factor in the *Chambers* analysis.

■ In the case *sub judice,* there is not sufficient assurance that the excluded testimony was reliable. Although Rubio's statements were made to a friend whom he presumably trusted, their conversation did not take place until several months after the transaction. Aside from Pena's own testimony, the only other corroborating evidence is a vague reference to a telephone call Rubio made to the BNDD in which the informant supposedly related that he had disclosed his role in the transaction to Pena and informed the defendant that Legarreta was a narcotics officer. At the time of trial, Rubio's whereabouts were unknown and the jury did not have the opportunity to observe his demeanor and assess his credibility. Most significantly, an examination of the proffer reveals that Rubio's so-called confession was not so clearly self-incriminatory or against his interest as to convince this court that he would not have made the statement if it were untrue.

■ The record before us will not support a conclusion that the exclusion of this hearsay unfairly deprived defendant of an opportunity to present his theory of the case to the jury. *See Truman v. Wainwright,* 514 F.2d 150 (5th Cir. 1975); *Maness v. Wainwright,* 512 F.2d 88 (5th Cir. 1975). The proffered testimony does not fall within any exception to the hearsay exclusionary rule and thus was properly classified as inadmissible.

## II. SPEEDY TRIAL

Pena's speedy trial challenge is twofold. He asserts that the delays preceding his trial and retrial were in excess of those provided in the Plan for the United States District Court for the Southern District of Texas for achieving Prompt Disposition of Criminal Cases (the Plan) and were violative of his Sixth Amendment right to a speedy trial.

Over three and one-half years elapsed between the date of the offense and Pena's conviction. The alleged illegal

sale of narcotics occurred on July 16, 1971. Pena was arrested on November 3, 1971, and an indictment was returned on January 26, 1972. On February 25, 1972, Pena was arraigned and pled not guilty. On two occasions (August 15, 1973 and October 23, 1973), Pena's co-defendant was granted a 60-day continuance. Pena formally consented to the October continuance. Defendant's first trial, held on June 3–6, 1974, resulted in a mistrial. Pena was retried and convicted on January 20–23, 1975.

To adequately resolve the Plan violation issue, we remanded this case to the district court for supplemental findings of fact. In an unpublished opinion-order dated December 17, 1975, which effectuated that remand, we analyzed and disposed of Pena's claim concerning the period of delay preceding his original trial.

The Plan for the Southern District of Texas first became effective on March 9, 1973. At that time, Section 2(b) required that trial commence within 90 days of a plea of not guilty for defendants who were not in custody. When the Plan became effective, more than a year had elapsed since Pena's arraignment. The government's contention that the Plan had no application to cases already docketed on its effective date is not correct. The spirit of the Plan required the court and the prosecutor to try all criminal proceedings including these pending cases as quickly as possible, and nothing in the wording of the Plan excepts them. Indeed, as the oldest pending criminal cases, they should have been accorded no less than the same treatment given to those newly filed.

Nevertheless, the delay preceding the original trial did not warrant dismissal of the indictment. After adoption of the Plan, a postponement of four months was attributable to two defense continuances to which Pena did not object. Trial commenced approximately five and one-half months after these continuance periods ended. While this delay exceeded the 90 days prescribed by the Plan, we must again "take cognizance that the remedial requirements of the Plan were new and that the 'busy districts [the Southern District of Texas had the heaviest pending workload at the time of any district in this Circuit] may find it difficult to operate under them impeccably.'" *United States v. Shepherd,* 511 F.2d 119, 124 n. 6 (5th Cir. 1975), *citing United States v. Rodriguez,* 497 F.2d 172, 176 (5th Cir. 1974). Further, although the Plan could not be disregarded, it is reasonable to expect that districts with impacted dockets would encounter special problems conforming pending cases to the requirements of the Plan. For these reasons, we decline to hold that dismissal of the action would have been the proper order to remedy the delay preceding the original trial.

■ At that time, the record did not reflect sufficient evidence to indicate whether the delay preceding defendant's retrial constituted a Plan violation of such magnitude as to warrant dismissal of the indictment. The remand for supplemental findings by the district court stated:

Pena's separate challenge concerning the delay between the date of mistrial and the second trial merits further consideration. Section 7 of the Plan provides:

Where a new trial has been ordered by the District Court or a trial or a new trial has been ordered by an appellate court, it shall commence at the earliest practicable time but in any event not later than 90 days after the order therefore becomes final unless extended under Section 3.

In this case, the retrial was held 228 days after the original trial and 138 days after the deadline established by Section 7. No written extensions were granted. The record contains no explanation for the delay and the government, in its brief, merely asserts that it cannot be expected to make a showing of the *court's* reasons

for delay. That is no answer to defendant's challenge that someone's violation of the Plan entitles him to relief. To enable the district court to develop the facts surrounding the reasons for the 228-day delay in retrying Pena, we remand this proceeding to the district court with directions to conduct any further proceedings it may deem necessary to enable it to supplement the record on appeal in this cause with an order which explicates the facts and factors which produced the over maximum delay in retrial.

As we recognized in *Rodriguez*, there are instances when an exceptionally crowded docket or other unusual conditions will constitute such "exceptional circumstances" as will justify a Section 3 extension of the time limitations. 497 F.2d at 176.

The district court supplemented the record in this court on January 14, 1976, with a memorandum outlining the acutely congested trial docket conditions prevailing in the Southern District of Texas immediately prior to Pena's retrial. The most notable factors contributing to the delay were the impossibility of giving preference to retrials due to a backlog of pending criminal cases and the court's pre-emptive occupation with a major criminal antitrust suit involving multiple defendants. This new evidence shows that "exceptional circumstances" justified an extension of the Plan's time limitations and thus no remedial action will be taken by this court.

▮ Pena's speedy trial constitutional challenge must also fail. The four-pronged test of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which is apropos here, provides that the court must balance the following factors in assessing an alleged Sixth Amendment violation: 1) length of delay, 2) reasons for delay, 3) defendant's assertion of his right, 4) prejudice to the defendant.

▮ The period of delay between the date of defendant's arrest and second trial was considerable—over three years.

Much of this delay, however, was attributable to the court's grossly congested docket and Vega's requests for continuances. During this time, defendant never demanded a speedy trial. Rather, he expressly consented to a second continuance by his co-defendant preceding the original trial. Finally, Pena has not convinced this court that he was prejudiced by the delay. Defendant's claim that he lost the testimony of two material witnesses as a result of the delay is not persuasive. Ruben Rubio, a party present at the New Manhattan Lounge the night of the transaction, died the interval between Pena's first and second trial. Although apparently then available, he was not called by the defense at the first trial and Pena does not explain how the absence of his testimony at the second trial could have been harmful to the defendant. Moreover, there is no showing that the informer Rubio would have been available to testify if the original trial had been held promptly after defendant's arraignment. Our only information is that Rubio disappeared sometime after his conversation with Garcia in November 1971. In sum, despite its length, the delay here does not rise to a level of a constitutional violation.

### III. SUFFICIENCY OF THE EVIDENCE—CONSPIRACY COUNT

The jury was properly instructed that if it found one of the defendants not guilty, it could not return a guilty verdict against the other defendant unless it found that he conspired with at least one person other than his now-exonerated co-defendant. There was no charge explaining that a conviction cannot be based on an alleged "conspiracy" between an accused and a government agent or informer. *See United States v. Williamson*, 450 F.2d 585 (5th Cir. 1971), cert. denied, 405 U.S. 1026, 92 S.Ct. 1297, 31 L.Ed.2d 486 (1972). Pena insists that since his co-defendant Vega was acquitted on the conspiracy count, the only conceivable persons with whom defendant could have conspired were Officer Legarreta or John Rubio, both of whom

were government agents. From this premise defendant reasons that the jury based its verdict on this legally untenable conclusion.

Specifically, Pena asks this court to reverse on the basis of the incompleteness of the trial court's instructions with respect to the conspiracy charge. However, the heart of defendant's objection goes to the sufficiency of the evidence and we treat it in that light.

■ The government attempts to counter Pena's challenge by contending that the evidence did not foreclose the possibility of a conspiracy with persons unknown as charged in the indictment. As possible unknown conspirators, the government suggests the ultimate supplier of heroin and "Don Lupe," the bartender at the New Manhattan Lounge. Neither speculation finds support in the evidence, however. The jury heard no testimony tending to establish that Pena conspired with another specific individual to obtain his supply. Similarly, the only evidence to connect the bartender with Pena is Officer Legarreta's statement on cross-examination that the bartender approached defendant and warned him not to discuss narcotics with people he didn't know. Even viewing this evidence in a light most favorable to the government, it is too slim to convince any reasonable minded juror that Pena was engaged in a conspiracy with "Don Lupe" to distribute heroin. Accordingly, we reverse defendant's conviction on conspiracy and direct the court to remove the impediment of the sentence imposed and suspended on that count.

## IV. JURY INSTRUCTIONS

■ Defendant claims that the charge to the jury was deficient in two respects. First, the following instruction is challenged as impermissibly shifting the burden of proof to the defendant:

[S]o that if there are two reasonable theories, equally supported by the evidence, one of which is consistent with the guilt of the Defendant and the other consistent with his innocence, then you must adopt the theory consistent with his innocence and acquit him, because he could not be said to be guilty "beyond a reasonable doubt."

Since defendant did not object to the court's statement at trial, our review is for plain error only. Fed.R.Crim.P. 52(b). The adequacy of the charge must be judged in its entirety and in light of the proof adduced. Here we find that the court repeatedly emphasized that the burden of proof was on the government. Even if the above portion, standing alone, might appear to shift that burden in certain factual situations, the overall charge given in this case cannot be said to be plainly erroneous. *See United States v. Prince,* 515 F.2d 564, 566–67 (5th Cir. 1975).

■ Finally, defendant complains that the court's refusal to give the defendant's requested charge on entrapment constitutes reversible error. In this circuit, a defendant is entitled to a so-called *Bueno* instruction if he comes forward with sufficient evidence to establish a prima facie case that the supplier of contraband was a paid informer or government agent. *United States v. Gomez-Rojas,* 507 F.2d 1213, 1218 (5th Cir. 1975). Pena's defense was that he acted merely as an agent for John Rubio in accepting the money from Legarreta. There was no evidence that John Rubio was a supplier of the heroin transferred. The *Bueno* instruction is not warranted if the government is merely the source of the money used to purchase the narcotics. *See United States v. Workopich,* 479 F.2d 1142, 1144–45 (5th Cir. 1973). Thus the court was correct in refusing defendant's request in this instance.

The convictions of Albert John Pena on Counts I and II and the sentence imposed on Count I are affirmed. The conviction on Count III is reversed.

Affirmed in part, reversed in part.