UNITED STATES of America, Plaintiff–Appellee,

v.

Alberto ESPINOSA–CERPA, Defendant–Appellant.

No. 79–5564.

United States Court of Appeals, Fifth Circuit.

Nov. 12, 1980.

Ronald A. Dion, Miami, Fla. (Court–appointed), for defendant–appellant.

W. Christian Hoyer, Asst. U. S. Atty., Tampa, Fla., for the United States.

Before KRAVITCH, HENDERSON and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

Appellant Alberto Espinosa–Cerpa was arrested along with his fellow crewmen on the shrimp boat, MISS PHYLLIS, when Coast Guard officers boarded that vessel in the Gulf of Mexico and found her to be carrying over 35,000 pounds of marijuana and to be bound for Key West, Florida. Espinosa–Cerpa subsequently was convicted in a jury trial of conspiracy to import marijuana into the United States, with intent to distribute same, in violation of 21 U.S.C. §§ 846, 963. He now attacks that conviction on three grounds, arguing: (1) that the prior acquittal in a separate trial of all his named alleged coconspirators (his three fellow crew members) should, as a matter of law, have precluded his conviction on the conspiracy charge; (2) that the trial court erred in refusing to suppress all evidence obtained from the Coast Guard's stop, boarding, and search of the MISS PHYLLIS, since that entire procedure had been accomplished without a warrant or even a reasonable suspicion that the MISS PHYLLIS or anyone on board was transgressing

any United States law; and (3) that he was denied a fair trial and that his *Miranda* rights were infringed by a prosecution witness' comment on his post–arrest silence. We affirm the conviction.

## I. *Background*

On the morning of May 13, 1979 a helicopter launched from the United States Coast Guard cutter DEPENDABLE, on patrol in the Gulf of Mexico, sighted the MISS PHYLLIS along with some other vessels in the Yucatan Straits about 150 miles outside United States territorial waters. For reasons not made clear below, the DEPENDABLE then began covertly following the MISS PHYLLIS, tracking her by radar.[1] At about 5:30 p. m. the DEPENDABLE intercepted the MISS PHYLLIS for a "standard boarding" under the authority of 14 U.S.C. § 89(a) "to ensure [the vessel's] compliance with all applicable U.S. laws." R.Supp. vol., pp. 10, 11, 28. Just prior to the boarding the captain of the DEPENDABLE ascertained by radio communication with the MISS PHYLLIS that she was of United States registry and that her next port of call was to be Key West, Florida.

While conducting a walking tour of the deck of the MISS PHYLLIS, the ensign leading the boarding party detected the odor of marijuana. Upon further investigation, the ensign discovered 839 bales of the substance, weighing 35,371 pounds and having a street value of about 14 million dollars. R. vol. 3, pp. 190, 192. The Coast Guard officers then arrested appellant, along with his cohorts, and seized and escorted the MISS PHYLLIS to port at St. Petersburg, Florida.

The four men captured on board the MISS PHYLLIS were all indicted for allegedly conspiring together and with other persons unknown to import and distribute the cargo of marijuana in the United States. All four originally were scheduled to be tried together. When however—as both parties have euphemistically labelled it—Espinosa–Cerpa "voluntarily absented himself" just prior to trial, the prosecution of the three remaining defendants proceeded. All three were acquitted of the conspiracy charge. After appellant was apprehended and returned to custody, he was tried individually and found guilty of conspiracy by a jury, despite the prior acquittal of his named alleged coconspirators.

## II. *Effect of Prior Acquittal of Coconspirators*

Appellant's foremost contention is that his conspiracy conviction should have been foreclosed as a matter of law after all of his named alleged coconspirators were acquitted. This contention may rest on either of two theories.

First, under the construct of nonmutual collateral estoppel, *see Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), it might be argued that the prior acquittal of all three other crewmen alleged to have taken part in the conspiracy should bar the government's subsequent relitigation in appellant's trial of the issue of their complicity in that conspiracy. This elimination of all those with whom appellant might have conspired[2] would, of course, have precluded his

---

1. At the hearing on the motion to suppress evidence garnered from the stop and search of the MISS PHYLLIS, the ensign who led the boarding party testified that the tracking and boarding had been ordered by radio by a Coast Guard Operations Commander in Miami. R.Supp. vol., pp. 8, 22. No further mention was made of such an order in the trial testimony of the DEPENDABLE's captain or of that ensign. In any event, no explanation was given for the decision to board the MISS PHYLLIS, whatever its source.

2. The government contends that even if the complicity of the other crew members was not

subject to relitigation at appellant's trial, his conviction need not fall. They point out that even where named coconspirators are acquitted, "a person can be convicted of conspiring with persons where names are unknown as long as the indictment asserts that such other persons exist and the evidence supports their existence [and complicity]." *United States v. Klein*, 560 F.2d 1236, 1242 (5th Cir. 1977), *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978), *quoting United States v. Lance*, 536 F.2d 1065, 1068 (5th Cir. 1976). *See, e.g., United States v. Allen*, 613 F.2d 1248, 1253 (3d Cir. 1980). Here, the government argues, Espinosa-Cerpa's indictment did charge the existence

conviction for conspiracy. *See Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975) (essence of conspiracy is agreement between two or more individuals).

■ In *Standefer v. United States*, —— U.S. ——, —— – ——, 100 S.Ct. 1999, 2006–09, 64 L.Ed.2d 689 (1980), however, the Supreme Court very recently rejected the applicability of nonmutual collateral estoppel to criminal cases, specifically holding that the prior acquittal of one party could not be invoked to bar the government's subsequent relitigation of the fact of that party's criminal conduct as an element in the prosecution of a second defendant. *See also, United States v. Musgrave*, 483 F.2d 327, 332 (5th Cir.), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973). Consequently, the avenue of collateral estoppel is not open to appellant.

The second theory, upon which defendant places his principal reliance, is that his prosecution and conviction for conspiracy should have been precluded by an extrapolation from the traditional tenet that a single conspirator may not be convicted in the same proceeding or prosecution in which all of his alleged fellows are acquitted.[3] *Herman v. United States*, 289 F.2d 362, 368 (5th Cir.), *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961) (applying traditional rule). *Accord, e.g., United States v. Shuford*, 454 F.2d 772, 779 (4th Cir. 1971); *Romontio v. United States*, 400 F.2d 618 (10th

Cir. 1968), *cert. dismissed*, 402 U.S. 903, 91 S.Ct. 1384, 28 L.Ed.2d 644 (1971). *See generally*, Annot., 91 A.L.R.2d 700, 703–08 (1963) (and cases cited therein). The apparent basis for the traditional rule is the notion that the acquittal of all but one potential conspirator negates the possibility of an agreement between the sole remaining defendant and one of those acquitted of the conspiracy and thereby denies, by definition, the existence of any conspiracy at all. *See, e.g., United States v. Goodwin*, 492 F.2d 1141, 1144 (5th Cir. 1974); *Farnsworth v. Zerbst*, 98 F.2d 541, 544 (5th Cir. 1938), *cert. denied*, 307 U.S. 642, 59 S.Ct. 1046, 83 L.Ed. 1523 (1939) ("such judgments prove that there was in fact no criminal agreement"); *United States v. Austin–Bagley Corp.*, 31 F.2d 229, 233 (2d Cir.) *cert. denied*, 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002 (1929) (per L. Hand, J.; "verdict must not itself deny the existence of the essential facts" of conspiracy); *Feder v. United States*, 257 F. 694, 697 (2d Cir. 1919) ("reason for the rule is . . . the indivisibility of the crime"). Appellant argues, therefore, that it is a natural extrapolation from this principle that a lone alleged conspirator should also not be susceptible to conviction in a separate prosecution following the acquittal of all of his alleged coconspirators. *United States v. Bruno*, 333 F.Supp. 570, 577–78 & n.10 (E.D.Pa.1971) (adopting extension urged here by appellant).

■ Aside from any potential flaws in such an extrapolation itself, however, we

of unknown coconspirators, and their actual participation may be inferred from the fact that other individuals must have been implicated to accomplish the financing, unloading and planned distribution of the 35,000 pounds of marijuana on board the MISS PHYLLIS.

While the government correctly states the law, we do not believe that the evidence supports its application to this case. There was absolutely no direct evidence at trial of the participation of anyone other than those on board the MISS PHYLLIS. The government relies solely on the inference outlined above. In *United States v. Pena*, 527 F.2d 1356, 1365 (5th Cir.), *cert. denied*, 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976), this court previously rejected a very similar inference, in essentially the same situation, as inadequate to support the conviction of a single named con-

spirator. *Id.* at 1365 (rejecting inference of conspiracy with unidentified supplier of narcotics). Accordingly, we shall analyze this case as if the named alleged conspirators were the only ones with whom appellant might have conspired.

3. The rule has also spawned the corollary that where two or more defendants are convicted of conspiracy and, for whatever reason, all but one have their convictions reversed on appeal or are granted a new trial, the conviction of the remaining conspirator also cannot stand. *See, e.g., Hartzel v. United States*, 322 U.S. 680, 682 n.3, 64 S.Ct. 1233, 1234 n.3, 88 L.Ed. 1534 (1944); *United States v. Peterson*, 488 F.2d 645, 651 (5th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974); *Feder v. United States*, 257 F. 694, 696–97 (2d Cir. 1919).

have some difficulty with the notion, recited above, upon which the basic rule is premised and, therefore, with the soundness even of that traditional rule. The notion that the acquittal of one's alleged coconspirators concludes the fact of their noncomplicity misapprehends the true nature of an acquittal in the scheme of trial by jury in the American criminal justice system. It has long been recognized that criminal juries in the United States are free to render "not guilty" verdicts resulting from compromise, confusion, mistake, leniency or other legally and logically irrelevant factors. *Dunn v. United States,* 284 U.S. 390, 393–94, 52 S.Ct. 189, 190–191, 76 L.Ed. 356 (1932). Consequently, an acquittal is not to be taken as the equivalent of a finding of the fact of innocence; nor does it necessarily even reflect a failure of proof on the part of the prosecution.[4] Thus, contrary to the notion underlying the rule in question, a jury's acquittal of some coconspirators should not be taken to negate the fact of their possible criminal complicity with any remaining alleged coconspirators.

Moreover, the premise and resultant rule are antithetical to the general understanding, deriving from the principle of jury prerogative recognized in *Dunn,* that

the apparent logical inconsistency of jury verdicts, even among multiple defendants tried together on essentially the same evidence and charges, provides no basis for attacking an otherwise valid guilty verdict adequately supported by the evidence; rather, each such verdict or conviction is to be reviewed wholly independently of the others. *See, e. g., United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943); *Odom v. United States,* 377 F.2d 853, 857 (5th Cir.1967), *cert. dismissed,* 400 U.S. 23, 91 S.Ct. 112, 27 L.Ed.2d 122 (1970). *Accord, e. g., United States v. Dunn,* 564 F.2d 348, 360 & n.24 (9th Cir.1977) (noting joint conspiracy trials as exception to general rule); *United States v. Martorano,* 557 F.2d 1, 8–9 (1st Cir.1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978); Annot., 22 A.L.R.3d 717 (1968) (and cases cited therein). "While symmetry of results may be intellectually satisfying, it is not required." *Standefer v. United States,* —— U.S. at ——, 100 S.Ct. at 2009. Thus, there is serious question as to the logical foundation for the continued application of the basic rule upon which appellant relies and which he seeks here to extend.[5]

4. Recognition of this principle was fundamental to the Supreme Court's decision in *Standefer* not to extend nonmutual collateral estoppel effects from the acquittal of an alleged principal in crime to the subsequent trial of his alleged aider and abettor. —— U.S. at ——, 100 S.Ct. at 2007. Of course, regardless of the true basis of a particular "not guilty" verdict, relitigation against the *same defendant* of facts involved in another charge of which he has previously been acquitted may be precluded by principles of double jeopardy. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). Those considerations are not germane here, however. *Standefer v. United States,* —— U.S. at ——, 100 S.Ct. at 2007 n.16.

5. The rule undoubtedly was originally simply transplanted from the English system in which it had been applied since the time of Henry IV. *See Feder v. United States,* 257 F. at 696–97 (reliance on English caselaw); 2 Wharton's Criminal Law § 1676 and nn. 12 & 13 (12th ed. 1932). A brief examination of the origin and evolution of the rule in that system provides perhaps the most damning indictment of its continued use in our system.

The history and development of the doctrine that the conviction of a single conspirator may not stand if all his alleged coconspirators are acquitted was reviewed at some length in the relatively recent decision of the House of Lords in *R. v. Shannon,* [1974] 2 All E.R. 1009 (H.L.). The *Shannon* opinions disclosed that this rule requiring the quashing of such convictions apparently developed at a time, long since past, when review of such proceedings (under writs of error) was restricted to a formal "record" of the indictment, plea, verdict and the like, to determine if there was such an apparent inconsistency or "repugnancy" on the face of the record as required reversal. *Id.* at 1029–30, 1037, 1043, 1048. *See also,* 1 W. Holdsworth, A History of English Law 212–17 (3d ed. 1922). Most significantly, English appellate tribunals had no capacity to review the evidence to determine whether it was sufficient to support the conviction of the lone conspirator. [1974] 2 All E. R. at 1029–30, 1037, 1043, 1048. Thus, *the rule emerged merely as a product of this* review procedure based on the theory that such an inconsistency more often than not signalled that an error had been made by the jury in the conviction. *Id.* at 1043. The original basis and rationale for the rule largely vanished, of

■ While we are not at liberty in this case to rule upon the continued vitality of that tenet in its original form, we certainly are not disposed to extend its scope to overturn an otherwise valid conviction rendered in a proceeding subsequent to that in which appellant's alleged conspirators were acquitted. In addition to the criticisms that may be levelled at the rule itself, such an extension would also ignore the fact that different evidence might have been presented in the two proceedings [6] or that the two juries might quite reasonably have taken different views of the same evidence. Finally, the rule that appellant seeks to invoke would be blatantly inconsistent with the Supreme Court's decision in *Standefer.* Whether or not labelled as nonmutual collateral estoppel, it would operate in an almost identical manner, barring relitigation of the fact of the other crewmen's having

engaged in a conspiracy with appellant solely on the basis of their prior acquittal of that charge. Consequently, we hold that the prior acquittal of appellant's named alleged coconspirators did not preclude his later conviction for having conspired with them.

### III. *Boarding of the MISS PHYLLIS*

Appellant argues that the Coast Guard practice of arbitrary, warrantless boardings and inspections of American flag vessels on the high seas under § 89(a),[7] such as the boarding of the MISS PHYLLIS, contravenes the recent Fourth Amendment pronouncements of the Supreme Court in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) and *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).[8] In *Prouse* and *Bar-*

course, with the onset of pervasive evidentiary review just after the beginning of the twentieth century. *See* Criminal Appeal Act of 1907, 7 Edw. 7, c. 23; §§ 3, 20(1), (4). Nonetheless, the rule itself has stubbornly persisted in various forms even to the present. *Compare R. v. Shannon* [1974] 2 All E. R. at 1034–35 (opinion of L. Morris) *with R. v. Shannon* [1974] 2 All E. R. at 1040–41, 1047 (opinions of V. Dilhorne and L. Simon).

This exposition in *R. v. Shannon* of the historical basis for the rule makes abundantly clear its inappropriateness to a modern American criminal justice system in which all verdicts obviously are, and always have been, subject to independent review for evidentiary support and where apparently inconsistent verdicts are almost uniformly tolerated whether explainable by variances in proof or merely as jury license. Indeed, even in England (where inconsistencies in verdicts are not so liberally received, *see* Archbold's Pleading, Evidence and Practice in Criminal Cases ¶¶ 621–22 (40th ed. 1979)) the continued vitality of the rule has now come into serious question. *See, e. g.,* Criminal Law Act of 1977, c. 45, § 5.–(8), (9) (abrogating the doctrine as a per se rule); Law Comm'n, Report on Conspiracy and Criminal Law Reform 24–27 (1976) (and sources cited therein).

**6.** The government suggests that in this case there was some discrepancy in the testimony of *prosecution witnesses* at the trial of the other crewmen that was clarified in the Espinosa–Cerpa trial. Gov't br. at 9–10.

**7.** 14 U.S.C. § 89(a) provides:

(a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

**8.** *Appellant is not alone in his criticism. See, e. g., United States v. Piner*, 608 F.2d 358, 361 (9th Cir.1979) (requiring reasonable suspicion of illegality or fixed administrative standard removing discretion from officers in the field

*low's*, respectively, the Court held that the Fourth Amendment proscribed random, roving stops of automobiles for license and registration checks and warrantless, administrative safety inspections of business premises.

This court made clear its rejection of appellant's basic position, however, in its recent en banc opinion in *United States v. Williams*, 617 F.2d 1063, 1075, 1077–78 (5th Cir.1980). There Judge Rubin in his special concurrence eloquently pleaded the case (urged here by appellant) for application of the land–based principles embodied in *Prouse, Barlow's*, and other cases of that vein, to Coast Guard stops and boardings under § 89(a). *Id.* at 1096–98. The majority of the court declined to follow his exhortations, however, and instead reaffirmed the view articulated in *United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc) *modified en banc on other grounds*, 612 F.2d 887 (5th Cir.1980), that § 89(a), consistently with the Fourth Amendment, "gives the Coast Guard plenary power to stop and board any American flag vessel anywhere on the high seas [outside the twelve–mile limit] in the complete absence of any suspicion of criminal activity." 617 F.2d at 1075, 1077 (though the facts of that case dealt with the boarding of a foreign flag vessel); *United States v. Robbins*, 623 F.2d 418, 420 (5th Cir.1980). *See also United States v. Freeman*, 579 F.2d 942, 946–47 (5th Cir.1978) (articulating bases for not applying land–based search and seizure principles to stops at sea).

■ Although this authority most commonly is invoked to justify stops ostensibly

made for the purpose of safety and documentation inspections, *e. g., United States v. Robbins*, 623 F.2d at 420, this court has also held that the authority permissibly extends to boardings "to look for obvious customs and narcotics violations." *United States v. Conroy*, 589 F.2d 1258, 1265 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979), *quoting United States v. Warren*, 578 F.2d at 1065. Thus, the "standard boarding" of the MISS PHYLLIS "to ensure compliance with all applicable U.S. laws" was consistent with the law as interpreted by this court.

Once on board, the odor of marijuana, detected by the ensign in the boat's pilothouse while he was being conducted around the vessel by its master, R. vol. 3, p. 174, justified the further investigation that revealed the marijuana in the ship's hold and stacked in the crew's quarters. *United States v. Williams*, 617 F.2d at 1086–87. *See e. g., United States v. Hicks*, 624 F.2d 32, 33–34 & n.2 (5th Cir.1980); *United States v. Mann*, 615 F.2d 668, 670 (5th Cir. 1980). Consequently, no Fourth Amendment violation occurred.

### IV. *Comment on Defendant's Silence*

Finally, Espinosa–Cerpa contends that his *Miranda* rights and his right to a fair trial were breached by the testimony of the arresting officer, given during the prosecution's case–in–chief, in which he twice commented on the MISS PHYLLIS crew's silence following their being arrested and given *Miranda* warnings. The offensive exchange between court, counsel and witness is reproduced in the margin.[9]

for boardings accomplished pursuant to § 89(a)); 3 W. LaFave, Search & Seizure § 10.8(f) at 35–44 (Supp.1980); Note, *High on the Seas: Drug Smuggling, The Fourth Amendment, and Warrantless Searches at Sea*, 93 Harv.L.Rev. 725, 738–51 (1980).

**9.** Q: Now, go ahead and tell us what you did.
A: \* \* \*
I broke out a standard form we have, which is a list of rights to give someone their rights when you suspect that they have committed a crime. I–"These are your Rights. Go ahead and read them. If you have any questions, ask questions." I questioned the fact of waiving

their Rights, decided they did not want to waive their Rights, did not want to make any statement at that point, signed these forms––
MR. DION: We object at this point, based on––
THE COURT: Beg your pardon?
MR. DION: We object, based on Fifth Amendment grounds. If we could approach the bench?
THE COURT: No, I'm going to overrule the objection. He can tell about giving them their Rights and indicate that they–and let me say, ladies and gentlemen, you are instructed that the purpose of giving the Rights–reading the Rights to a Defendant,

Appellant is correct in asserting that the witness' comments were in derogation of appellant's *Miranda* and Fourteenth Amendment due process rights. *Miranda v. Arizona*, 384 U.S. 436, 468 n.37, 86 S.Ct. 1602, 1624 n.37, 16 L.Ed.2d 694 (1966) (prosecution may not use defendant's silence at trial); *United States v. Edwards*, 576 F.2d 1152 (5th Cir.1978); *Chapman v. United States*, 547 F.2d 1240, 1242–43 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977) (comment is violation of due process). *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (reference to defendant's silence in cross-examination for impeachment purposes violates due process). That the prosecution may not have intended that the witness make such a comment neither absolves the sin nor eliminates any potential prejudice. *United States v. Staller*, 616 F.2d 1284, 1291 (5th Cir.1980); *United States v. Matos*, 444 F.2d 1071, 1072 (7th Cir.1971).

Nonetheless, we are convinced that the error in this case was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The potential for real prejudice from the comments was virtually nil. The witness' statements were isolated and unsolicited, never "highlighted" by repeated questioning or subsequent reference by the prosecutor. *See United States v. Davis*, 546 F.2d 583, 594–95 (5th Cir.), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). The comments in no way undermined any exculpatory defense. *Cf. United States v. Harp*, 536 F.2d 601, 603 (5th Cir. 1976) (court condemned comments on silence that "struck at the jugular" of the accused's defense). Finally, in light of the court's curative instruction and the other-wise overwhelming evidence of guilt deriving from the mere circumstances of appellant's arrest, the conclusion that the error was harmless is virtually inescapable. *United States v. Staller*, 616 F.2d at 1292; *Chapman v. United States*, 547 F.2d at 1247–50.

For the reasons stated above we affirm appellant's conviction.

AFFIRMED.

KRAVITCH, Circuit Judge.

I concur in the result.

---

that is what are known as *Miranda* Rights, Rights that they don't–not required to make any statement and that any statement they might make would be used against them; that under the Fifth Amendment to the Constitution, any person has a Right not to make a statement. And the fact they don't make a statement cannot be used [against] them. All right. Go ahead.

MR. DION: For the record, we would also ask for a mistrial.

THE COURT: Yes, Sir, I will deny that.

\* \* \* \* \* \*

Q: Now, after you placed the men under arrest, without regard to what anybody said–in other words, don't tell us what other people said. Tell us what you did. Did you inspect the boat any further to see what was in–

A: Yes, we did. Picking up at the point of advising them their Rights and them deciding not to make a statement–

R. vol. 3, pp. 173–78.