**UNITED STATES of America, Plaintiff,**

v.

**SUNTAR ROOFING, INC., and David Kevin Pratt, Defendants.**

No. 88–20084–01.

United States District Court, D. Kansas.

April 5, 1989.

Diane C. Lotko–Baker, U.S. Dept. of Justice, Antitrust Div., Chicago, Ill., for the U.S.

Bryon Neal Fox, Kansas City, Mo., Ronald P. Woods, Overland Park, Kan., Ronald E. Partee, Thomas M. Bradshaw, and Walter R. Randall, Jr., Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is before the court on the motion of the defendants Suntar Roofing, Inc., (Suntar) and David Kevin Pratt (Pratt) for judgment of acquittal or for a new trial. The posture of the case is as follows:

On September 21, 1988, Suntar and Pratt, Suntar's president, along with Ronan's Roofing, Inc., (Ronan's Roofing) and its president, Michael T. Ronan (Ronan), were indicted by a grand jury. The one count indictment alleged that the defendants conspired to allocate roofing customers in violation of section 1 of the Sherman Antitrust Act. In its voluntary bill of particulars filed on November 21, 1988, the government identified three unindicted co-conspirators: (1) Tom Keaton (Keaton), a part-owner of Suntar and another roofing company, Keaton Brothers Roofing and Siding, Inc., (2) Andy Boxley (Boxley), a Suntar employee during the time frame of the alleged conspiracy, and (3) Samuel K. "Bud" Fleenor (Fleenor), an employee of Ronan's Roofing.

The case was tried to a jury, which on February 13, 1989, returned a verdict of not guilty as to the defendants Ronan's Roofing and Ronan, and a verdict of guilty as to the defendants Suntar and Pratt. Suntar and Pratt moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), or for a new trial pursuant to Rule 33. The defendants' motion is based on the following assertions:

(1) The evidence at trial was insufficient to support the jury's finding of conspiracy.

(2) The court improperly instructed the jury.

(3) The court erred in its ruling prior to trial that the alleged crime was a *per se* violation of the Sherman Act, thereby precluding the defendants from offering evidence of reasonableness, economic or other justification, or lack of intent to violate the law or restrain trade.

(4) The court improperly allowed the government to introduce similar acts evidence under Federal Rule of Evidence 404(b).

(5) The court erred in failing to require that Suntar's counsel withdraw because of an asserted conflict of interest.

(6) The court erred in its rulings on various motions before and during trial.

The government has responded to the defendants' motion, the parties have orally argued the motion at a hearing, and the court is now prepared to rule on the motion.

## I. *The Legal Standards.*

The Tenth Circuit has stated the standards to be applied when considering a motion for a judgment of acquittal:

[the trial court must] view the evidence in the light most favorable to the government and then determine whether there is substantial evidence from which a jury might properly find the accused guilty beyond a reasonable doubt.

*United States v. White,* 673 F.2d 299, 301 (10th Cir.1982) (citations omitted); *see also United States v. Posey,* 647 F.2d 1048, 1051 (10th Cir.1981). The court should "enter a judgment of acquittal only if the evidence that [the] defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *White,* 673 F.2d at 301.

 The court has broader discretion in considering a motion for a new trial. The court may evaluate the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice has resulted. However, the discretion of the court "should be exercised with caution, and the power to grant a new trial on this ground should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." 3 C. Wright, *Federal Practice and Procedure: Criminal* § 553 (2d

ed. 1982). Any error which would require reversal on appeal is a sufficient basis for granting a new trial. *Id.* § 556.

## II. *The Evidence.*

### A. The Agreement.

The defendants contend that the court should have sustained their Rule 29 motion at the close of the government's evidence and at the close of all evidence because there was insufficient evidence of an agreement and an effect on interstate commerce.

■ Ample evidence of an agreement involving Suntar and Pratt, on one hand, and Ronan's Roofing and/or Ronan, on the other hand, was provided at trial by Boxley and Fleenor. Boxley testified that he observed Ronan and Pratt leave the Suntar offices together. When Pratt returned, he told Boxley that Pratt and Ronan had agreed to end the price war and that Suntar and Ronan's Roofing would each get back their original customers. Fleenor testified that he and Pratt met and discussed the price war, told each other what they intended to do to end the price war, and then did what they had said that they would do. Fleenor also testified that he did not believe that he had an agreement with Pratt because he (Fleenor) intended to pursue his own, unstated agenda. However, the jury was entitled to weigh the evidence, and from all the testimony, the jury could reasonably conclude that an agreement was reached. The court concludes that neither a judgment of acquittal nor a new trial is merited on the basis of the alleged lack of evidence regarding an agreement.

### B. The Verdict.

The defendants assert that given the jury's verdict, it was legally impossible for Suntar and Pratt to conspire as alleged in the indictment. Their argument is as follows: The indictment in this case alleged a conspiracy involving the defendants Suntar, Pratt, Ronan's Roofing, and Ronan, and three unindicted coconspirators: Boxley, Fleenor, and Keaton. Suntar and Pratt could not conspire with each other. Boxley, who was a Suntar employee, could

not conspire with Suntar and Pratt. Similarly, Keaton, a Suntar owner who the government contended was the alterego of Suntar, could not conspire with Suntar and Pratt. Finally, the jury found that Ronan's Roofing and Ronan were not guilty of conspiring in violation of the Sherman Act, and thus neither they nor Fleenor, a Ronan's Roofing employee, conspired with Suntar and Pratt. Thus, the defendants argue, given the law and the jury's verdict, there was no party with whom Suntar and Pratt could conspire, and a judgment of acquittal or a new trial is merited.

■ The defendants are correct in stating that Suntar and Pratt could not conspire with each other. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769, 104 S.Ct. 2731, 2740, 81 L.Ed. 2d 628 (1984); *Holter v. Moore & Co.,* 702 F.2d 854, 855 (10th Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 347, 78 L.Ed.2d 313 (1983). Further, Boxley and Keaton could not conspire with Suntar and Pratt, *see id.,* as the government tacitly agrees by not addressing this issue in its brief before the court.

■ However, the defendants are incorrect in their assertion that because of the jury's determination that Ronan's Roofing and Ronan were not guilty of conspiring, the court should grant a new trial or enter a judgment of acquittal for Suntar and Pratt. In determining the merits of the defendants' motion, the court focuses on the evidence presented at trial rather than on the jury's verdict, and, as discussed above, ample evidence of an agreement was presented at trial.

■ Our review of the defendants' argument regarding the jury verdict begins with a recognition of the general tenet that consistency in verdicts is not required. *See Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974) (citing *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943); *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932)). However, a traditional exception to this general rule states that a

single conspirator [1] may not be convicted in the same proceeding or prosecution in which all of his alleged coconspirators are acquitted.[2] *See United States v. Howard,* 751 F.2d 336, 338 (10th Cir.1984) (stating the traditional exception and citing *Romontio v. United States,* 400 F.2d 618, 619 (10th Cir.1968), *cert. dismissed,* 402 U.S. 903, 91 S.Ct. 1384, 28 L.Ed.2d 644 (1971)), *cert. denied,* 472 U.S. 1030, 105 S.Ct. 3507, 87 L.Ed.2d 638 (1985); *see also United States v. Wright,* 742 F.2d 1215, 1224 (9th Cir.1984), *overruled, United States v. Valles–Valencia,* 823 F.2d 381 (9th Cir. 1987); *United States v. Morales,* 677 F.2d 1, 3 (1st Cir.1982); *United States v. Williams,* 503 F.2d 50, 54 (6th Cir.1974); *United States v. Shuford,* 454 F.2d 772, 779 (4th Cir.1971); *Herman v. United States,* 289 F.2d 362, 368 (5th Cir.), *cert. denied,* 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed. 2d 93 (1961), *overruled, U.S. v. Andrews,* 850 F.2d 1557 (11th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989); *United States v. Austin–Bagley Corp.,* 31 F.2d 229, 233 (2d Cir.) (L. Hand, J.), *cert. denied,* 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002 (1929).

The soundness of the traditional exception was questioned by the former Fifth Circuit [3] in *United States v. Espinosa–Cerpa,* 630 F.2d 328 (5th Cir.1980). In *Espinosa Cerpa,* the defendant's alleged coconspirators were acquitted in a separate trial, and the defendant argued that the acquittal should have precluded his conviction on a conspiracy charge. *Id.* at 329. The court noted, *see id.* at 331, and then criticized the traditional exception:

The notion that the acquittal of one's alleged coconspirators concludes the fact of their noncomplicity misapprehends the true nature of an acquittal in the scheme of trial by jury in the American criminal justice system. It has long been recognized that criminal juries in the United States are free to render "not guilty" verdicts resulting from compromise, confusion, mistake, leniency or other legally and logically irrelevant factors. *Dunn v. United States,* 284 U.S. 390, 393–94, 52 S.Ct. 189, 190–91, 76 L.Ed. 356 (1932). Consequently, an acquittal is not to be taken as the equivalent of a finding of the fact of innocence; nor does it necessarily even reflect a failure of proof on the part of the prosecution. Thus, contrary to the notion underlying the [exception] in question, a jury's acquittal of some coconspirators should not be taken to negate the fact of their possible criminal complicity with any remaining alleged coconspirators.

Moreover, the premise and resultant [exception] are antithetical to the general understanding, deriving from the principle of jury prerogative recognized in *Dunn,* that the apparent logical inconsistency of jury verdicts, even among multiple defendants tried together on essentially the same evidence and charges, provides no basis for attacking an otherwise valid guilty verdict adequately supported by the evidence; rather, each such verdict or conviction is to be reviewed wholly independently of the others.... Thus, there is a serious question as to the logical foundation for the continued application of the basic [exception] upon which appellant relies and which he seeks here to extend.

*Id.* at 332. Because the defendant's case involved an acquittal of the codefendants at a separate trial, the court did not "rule

1. Because Suntar and Pratt could not conspire with each other, for purposes of this motion we may consider the jury's verdict as if it convicted only a single defendant.

2. Oddly, the defendants and the government failed to cite in their memoranda before the court or mention at the hearing any of the numerous cases dealing with the issue of inconsistent jury verdicts in conspiracy cases involving multiple defendants.

3. *United States v. Espinosa–Cerpa,* 630 F.2d 328 (5th Cir.1980), was decided in 1980, and was a case on appeal from the United States District Court for the Middle District of Florida. As of October 1, 1981, the "old" Fifth Circuit was divided into two circuits, the "new" Fifth Circuit and the Eleventh Circuit. Decisions of the "old" Fifth Circuit are binding on the "new" Fifth Circuit and the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981). The Eleventh Circuit includes the Middle District of Florida; thus, *Espinosa–Cerpa* would today be decided by the Eleventh Circuit.

upon the continued vitality" of the traditional exception, but rather declined to extend the exception to cover the facts presented. *Id.* at 333. Specifically, the court held that the acquittal of the defendant's alleged coconspirator at a separate trial did not preclude the defendant's later conspiracy conviction. *See id.* at 333 (the court relied on the Supreme Court's holding in *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), that the prior acquittal of a principal could not be used to bar the government's relitigation of the principal's criminal conduct as an element in the prosecution of an aider and abettor).

The vitality of the general rule [4] was reaffirmed in *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). In *Powell,* an indictment which included counts of possessing cocaine with the intent to distribute, conspiring to possess cocaine with the intent to distribute, and using the telephone to commit the above-mentioned felonies was handed down against a single defendant. *Id.* at 60, 105 S.Ct. at 474. The jury acquitted the defendant on the possession and conspiracy counts, but convicted her on the telephone facilitation counts. The defendant argued post-trial that the verdicts were inconsistent and that a reversal of the telephone facilitation convictions was required. The Ninth Circuit agreed. *See id.* The Supreme Court reversed, quoting language from *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932) (citations omitted):

> Consistency in the verdict is not required. Each count in the indictment is regarded as if it was a separate indictment. If separate indictments had been presented against the defendant ... and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as *res judicata* of the other. Where the offenses are separately charged in the counts of a single indictment the same

rule must hold. As was said in *Steckler v. United States,* 7 F.(2d) 59, 60 [ (2nd Cir.1925) ]:

> "The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."

*Powell,* 469 U.S. at 62–63, 105 S.Ct. at 475. *See also United States v. Swafford,* 766 F.2d 426, 429–30 (10th Cir.1985). Further, the *Powell* Court noted that a criminal defendant is protected from jury irrationality by the trial and appellate courts' review of the sufficiency of the evidence. *Id.* 469 U.S. at 67, 105 S.Ct. at 478; *see also Swafford,* 766 F.2d at 430. However, the Court stressed that this review must be independent of the jury's verdict. The Court stated:

> Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.

*Id.,* 496 U.S. at 67, 105 S.Ct. at 478.

The analogies between *Powell* and the instant action are easily drawn. In *Powell,* the verdict was inconsistent because the defendant was acquitted on the predicate counts but convicted on the facilitation counts; here, the verdict was inconsistent

---

**4.** The reader will recall that the general rule is that inconsistencies in jury verdicts will not be disturbed, and that the traditional exception to the general rule is that the conviction of a single conspirator cannot be upheld where all of the alleged coconspirators are acquitted in the same proceeding.

because Suntar and Pratt were convicted of conspiring even though, given the evidence, the only parties with whom they could conspire, Ronan's Roofing and Ronan, were acquitted. In *Powell*, each count against the defendant was to be viewed as a separate indictment; the instant case should be viewed as if a separate indictment alleging the same conspiracy was handed down for each defendant. In *Powell*, the sufficiency of the evidence regarding the facilitation counts was to be viewed independent of the jury's acquittal on the possession and conspiracy counts; in the instant action, the evidence regarding Suntar's and Pratt's participation in a conspiracy should be reviewed independent of the jury's acquittal of Ronan's Roofing and Ronan.

Were we to consider only the above-mentioned parallels between this case and *Powell*, we would be quite tempted to deviate from the traditional exception and to ignore the inconsistencies in the verdicts returned against the defendants in the instant action. However, we have even stronger reason to disregard the traditional exception.

Since *Powell*, two circuits have considered the vitality of the traditional exception. In the case with the strongest precedential value, the Eleventh Circuit held in an en banc opinion that a consistent verdict is not required in a conspiracy trial involving multiple defendants; a defendant's conviction is valid even if all alleged coconspirators are acquitted in the same proceeding. *See United States v. Andrews*, 850 F.2d 1557, 1561 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989). The Eleventh Circuit relied on *Powell*'s reaffirmation of the general rule which allows inconsistent verdicts to stand, and it overturned the traditional exception formerly applicable in the circuit as set forth in *Herman v. United States*, 289 F.2d 362 (5th Cir.), *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961).[5] *See*

*Andrews*, 850 F.2d 1560–62. The court emphasized that even though the traditional exception no longer applies, a criminal defendant charged with conspiracy is protected from jury irrationality by the independent review of the sufficiency of the evidence made by the trial and appellate courts on the defendant's motion. *See id.* at 1562. Finally, the court noted that "*Powell* teaches us that a not-guilty verdict for [a defendant] is not the same thing as a finding of insufficient evidence to allow a conviction." *Id.* at 1563 n. 15 (continued from 1562).

The Ninth Circuit has also re-examined the validity of the traditional exception in light of the *Powell* holding. In *United States v. Valles–Valencia*, 811 F.2d 1232 (9th Cir.1987), *modified*, 823 F.2d 381 (9th Cir.1987), a panel of the court set forth the traditional exception, and held as follows:

> On the basis of the consistency rule [ (which is referred to as the "traditional exception" in the instant order) ], Soto–Leal contends that his conspiracy conviction should have been vacated once the district court dismissed the conspiracy count against four of his co-defendants and the jury acquitted the other two of conspiracy. We agree.

*Id.* at 1239. On rehearing, the same panel amended its earlier order and allowed the conviction of Soto–Leal to stand in light of the Supreme Court's ruling in *Powell*.[6] The court stated:

> In the original opinion we applied the "rule of consistency" [ (referred to as the "traditional exception" in the instant order) ] to vacate Soto–Leal's conviction of conspiracy. We now reconsider the "rule of consistency" in light of the Supreme Court's recent holding in *Powell*. Because of the *Powell* decision, the broad language from *Lubin* [*v. United States*, 313 F.2d 419, 422–23 (9th Cir. 1963) ] to the effect that the acquittal of

---

5. As noted above, Fifth Circuit cases decided before October 1, 1981, are binding precedent in the Eleventh Circuit.

6. The initial *Valles–Valencia* order was issued on February 26, 1987. In the second *Valles–Valencia* order, entered on July 30, 1987, the court

cited *Powell* as a case decided in 1987, and seemed to imply that because of *Powell*, the law had changed since the entry of the first *Valles–Valencia* order. However, *Powell* was decided in 1984, well before the initial *Valles–Valencia* order.

all but one of the alleged co-conspirators requires the acquittal of the remaining defendant can no longer be relied upon. Each case must be examined carefully to see whether evidence of conspiring with others, known or unknown, was produced during the trial. Our earlier cases relying on the broad language must be deemed overruled in part by the Supreme Court's decision in *Powell.*

*United States v. Valles–Valencia,* 823 F.2d 381, 382 (9th Cir.1987), *modifying,* 811 F.2d 1232 (9th Cir.1987).

Thus, the two circuits which have addressed in detail the traditional exception following the *Powell* decision have found that the exception is no longer viable.[7] The Tenth Circuit, which has in the past endorsed the traditional exception, *see Romontio v. United States,* 400 F.2d 618, 619–20 (10th Cir.1968), has not addressed the vitality of the exception in light of *Powell.*[8] Nevertheless, this court declines to apply the traditional exception to set aside the convictions of Suntar and Pratt. We are confident that given the ruling in *Powell,* our focus should be on the sufficiency of the evidence of conspiracy presented at trial, rather than on the jury's verdict. As discussed above, sufficient evidence of a conspiracy was presented.

C. The Effect on Interstate Commerce.

■ The defendants further assert that the evidence regarding an effect on interstate commerce was insufficient. We disagree. As to the interstate commerce requirement of the Sherman Act, the Supreme Court has stated:

[O]ur cases have recognized that in enacting § 1 Congress "wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements...." *United States v. South–Eastern Underwriters Assn.,* 322 U.S.

533, 558 [64 S.Ct. 1162, 1176, 88 L.Ed. 1440] (1944). Consistently with this purpose and with the plain thrust of the statutory language, the Court has held that, however local its immediate object, a "contract, combination ... or conspiracy" nonetheless may constitute a restraint within the meaning of § 1 if it substantially and adversely affects interstate commerce. *E.g., Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 234 [68 S.Ct. 996, 1005, 92 L.Ed. 1328] (1948).

*Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 194–95, 95 S.Ct. 392, 398, 42 L.Ed. 2d 378 (1974). The defendants' activity itself must be in interstate commerce, or it must have an effect on some other appreciable activity demonstrably in interstate commerce. *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). Here, the activity of the defendants was purely local, and thus, there must be an effect on interstate commerce.

■ The defendants contend that the government failed to present evidence that the customer allocation agreement reduced the flow of goods in interstate commerce. However, as discussed in part IV below, the customer allocation agreement is a *per se* violation of the Sherman Act, *see Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (a division of markets is a per se violation), and the government is therefore not required to prove any adverse impact on interstate commerce. *United States v. Fischbach and Moore, Inc.,* 750 F.2d 1183, 1192 (3d Cir.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985). The Supreme Court addressed this issue in *Burke v. Ford,* 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967). In *Burke,* the Tenth Circuit held that there was insuffi-

---

**7.** The Sixth Circuit has, in dicta, recognized the traditional exception in an order post-dating *Powell. See United States v. Sachs,* 801 F.2d 839, 845 (6th Cir.1986). However, *Sachs* merely mentions the traditional exception; the opinion does not analyze the exception, comment on the exception's vitality in light of *Powell,* or rely on the exception in its holding. *See id.*

**8.** In *United States v. Howard,* 751 F.2d 336, 338 (10th Cir.1984), *cert. denied,* 472 U.S. 1030, 105 S.Ct. 3507, 87 L.Ed.2d 638 (1985), the Tenth Circuit noted the traditional exception. The *Howard* opinion was entered two weeks after *Powell* was issued. However, *Howard* understandably lacks any reference to *Powell.*

cient proof of an adverse effect on interstate commerce resulting from a horizontal territorial market division, stating:

> The retailers seem to rest their case on the hypothesis that the mere fact of market division and the resulting reduction in the number of wholesale outlets available to the respective distillers *ipso facto* proved the requisite adverse effect on the free flow of liquor in interstate commerce. In other words, they seem to argue that from this single fact we must infer that interstate commerce was adversely affected. But this is not so. The single fact of a reduced number of wholesale outlets does not give rise to the necessary implication that interstate commerce was adversely affected. While a division of the market is to be sure a *per se* violation of the anti-trust law, this postulate presupposes but it does not prove the requisite connection with commerce.

*Burke v. Ford*, 377 F.2d 901, 907 (10th Cir.) (citations omitted), *reversed*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967). The Supreme Court reversed, stating:

> The Court of Appeals held that proof of a statewide wholesalers' market division in the distribution of goods retailed in substantial volume within the State but produced entirely out of the State was not by itself sufficient proof of an effect on interstate commerce. We disagree. Horizontal territorial divisions almost invariably reduce competition among the participants. When competition is reduced, prices increase and unit sales decrease. The wholesalers' territorial division here almost surely resulted in fewer sales to retailers—hence fewer purchases from out-of-state distillers—than would have occurred had free competition prevailed among the wholesalers. In addition the wholesalers' division of brands meant fewer wholesale outlets available to any one out-of-state distiller. Thus the state-wide wholesalers' market division inevitably affected interstate commerce.

*Burke*, 389 U.S. at 321–22, 88 S.Ct. at 444 (citations and footnotes omitted). Thus, in *Burke*, the Supreme Court "held in the context of horizontal territorial market divisions that, as a matter of practical economics, a substantial adverse affect on interstate commerce results by virtue of the restraint, itself." *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1085–86 (5th Cir.), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978).

In the instant action, the government presented evidence of an agreement to allocate customers, a *per se* violation of section 1, and therefore, under *Burke*, it presented sufficient evidence of an effect on interstate commerce.

### III. *The Instructions.*

The defendants contend that the court erred in its instructions to the jury. The instructions which they challenge address four issues: (1) the requirements for an agreement under the Sherman Act, (2) the inability of a corporation to conspire with its own agents, (3) the interstate commerce requirement, and (4) the nature of a customer allocation conspiracy under the Sherman Act (i.e., whether the allocation is a *per se* violation).

■ In instructing a jury, the court is not required to give any specifically requested instruction as long as the court's instructions as a whole adequately state the law. *United States v. Hines*, 696 F.2d 722, 733 (10th Cir.1982). Further, even if a proposed instruction correctly states the law, the court need not give the instruction "if it is directed to a matter outside the issues presented and the evidence adduced." *Velasquez v. United States*, 244 F.2d 416, 420 (10th Cir.1957).

■ The defendants contend that the court should have instructed the jury as to the *agreement requirement under the Sherman Act* as follows:

#### Defendants' Proposed Instruction

The exchange of price information or price verification between competitors is not, in and of itself, unlawful. And, it is not unlawful for businessmen to attend meetings and discuss prices as long as they do not reach agreements as to the

prices to be charged. If a defendant tells an alleged co-conspirator that his price is going to be "X" dollars next week and there is no agreement or understanding by that defendant with anyone else that this price will influence another, that is not a conspiracy.

Similarity of competitive business practices of the accused, or the mere fact that they may have charged identical prices for the same goods and services, does not establish a conspiracy, since these practices of business concerns may be consistent with ordinary competitive behavior in a free and open market.

A business concern may lawfully charge prices identical to those charged by competitors, and still not violate the Sherman Anti–Trust Act. A business concern may even copy the price lists of a competitor, or follow and conform exactly to the price policies and price changes of competitors, and that without more, would not be a violation of the law, unless such acts were done pursuant to an agreement, or arrangement, or understanding between two or more persons, such as is charged in the indictment.

So, mere similarity or identity of prices charged does not without more, establish the existence of a conspiracy such as is charged in the indictment. However, such facts and circumstances, if shown by the evidence in the case, may be considered by the jury in determining whether the similarity or identity of pricing resulted from independent acts of business concerns freely competing in the open market, or whether it resulted from a mutual agreement, or arrangement, or understanding between two or more of them.

*Defendants' Proposed Instruction*

"Guilt by association" does not sustain a finding of conspiracy. A close-working relationship between a Defendant and another person does not permit you to infer a criminal or conspiratorial relationship. Mere similarity of conduct does not establish a conspiracy. The mere fact that Defendant and another person may have assembled together, either on a business or social level, to discuss common aims and interests does not without more establish a conspiracy. Even where a Defendant might have known that a business associate was engaged in criminal activity, this mere knowledge will not support a finding that the Defendant should have known of or shared his associate's specific criminal intent. The evidence must show beyond a reasonable doubt that the members of the alleged conspiracy willfully and in some way came to a mutual understanding to try to accomplish a single, common and unlawful plan to defraud.

The court notes that the defendants did not tailor the first instruction quoted above to the facts of this case, which involved a conspiracy to allocate customers rather than to fix prices. Further, the court is convinced that its instructions on agreement, particularly instructions 15, 17, 18, and 20, adequately charged the jury.

Instruction 15 stated:

Each defendant has been indicted for the crime of conspiracy to allocate customers for new roofs in the Kansas City, Kansas, metropolitan area in violation of Section 1 of the Sherman Antitrust Act. The existence of the conspiracy is an essential element of this crime. A conspiracy under Section 1 of the Sherman Antitrust Act is an agreement of two or more persons or corporations to accomplish a common objective which would result in an unreasonable restraint of interstate commerce.

One may become a member of a conspiracy without full knowledge of all the details of the conspiracy. On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.

A conspiracy to allocate customers is an agreement or understanding between competitors not to compete for the business of a particular customer or customers. A conspiracy to allocate customers is conduct that is unreasonable *per se;* that is, as a matter of law, the mere

doing of the act itself (the agreement to allocate customers) constitutes an unreasonable restraint on trade or commerce, and it is not necessary to consider why the acts were committed, their effect on the industry, or any other explanatory matter. Where conduct unreasonable *per se* is shown, it cannot be justified or excused by the elimination of competitive evils, the good motives of the conspirators, or the fact that the prices charged were not unreasonably high or arbitrary.

Before the jury may find that a defendant, or any other person, has become a member of a conspiracy, the evidence in the case must show beyond a reasonable doubt that the conspiracy was knowingly formed, and that the defendant knowingly participated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy.

To act or participate knowingly means to act or participate voluntarily and intentionally, and not because of mistake, or accident, or with innocent reason. If a defendant, understanding the unlawful character of a plan, intentionally encourages, advises or assists, for the purpose of furthering the undertaking or scheme, he thereby becomes a knowing participant—a conspirator.

One who knowingly joins an existing conspiracy is charged with the same responsibility as if he had been one of the originators or instigators of the conspiracy.

Instruction 17 stated:

While a conspiracy involves an agreement to violate the law, it is not necessary that the persons charged meet each other and enter into an express or formal agreement, or that they stated in words or writing what the scheme was or how it was to be effected. It is sufficient to show that they tacitly came to a mutual understanding to allocate customers.

The agreement may be shown by a concert of action by members who participate with knowledge of the common purpose. Direct proof of a conspiracy may not be available, and the common purpose and plan may be disclosed only by the circumstances and acts of the members, such as their course of dealings.

In determining whether the conspiracy charged in the Indictment existed, you should consider the actions and declarations of all of the alleged co-conspirators which were done to carry out an apparent criminal purpose together with any reasonable inferences to be drawn from such evidence. The act of conspiring constitutes the offense, and it is not necessary that the objectives of the conspiracy be achieved or that any other act be committed. The offense may be complete even if the conspiracy has not been carried out.

It is not the form of the conspiracy or the means used, but rather the unlawful results intended to be accomplished that the statute penalizes. The means used to accomplish the unlawful objective may be lawful or unlawful. Acts done to effectuate the conspiracy may be, in themselves, wholly innocent acts. Yet if they are part of the acts which are relied upon to give effect to the conspiracy, they come within the prohibition of the law.

The guilt or innocence of each of the defendants should be determined separately. However, in determining whether a conspiracy exists the evidence must be viewed as a whole and not piecemeal. If the jury finds beyond a reasonable doubt that a conspiracy existed and that a defendant was a participant, that defendant should be found guilty.

Instruction 18 read as follows:

In determining whether a conspiracy existed, the jury should consider the actions and declarations of all alleged participants. However, in determining whether a particular defendant was a member of the conspiracy, if any, the jury should consider only his acts and statements. He cannot be bound by the acts or declarations of other participants until it is established that a conspiracy existed, that he was one of the members, and that said declarations were made in the course of and in furtherance of the conspiracy.

To be a member of the conspiracy a defendant need not know all of the other members, nor all of the details of the conspiracy, nor the means by which the objects were to be accomplished. Each member of the conspiracy may perform separate and distinct acts. It is necessary, however, that the Government prove beyond a reasonable doubt that a defendant was aware of the common purpose, and was a willing participant, with the intent to advance the purpose of the conspiracy.

The extent of a defendant's participation is not determinative of that defendant's guilt or innocence. A defendant may be convicted as a conspirator even though that defendant plays a minor part in the conspiracy. That defendant's financial stake, if any, in the venture is a factor to be considered in determining whether a conspiracy existed, and whether that defendant was a member of it.

Instruction 20 stated:

In the absence of an agreement on a course of action that is designed to eliminate competition it is not unlawful for competitors to meet and exchange information necessary to preparation of a bid or discuss common aims or objectives or exchange information on independently derived prices.

■ Given these instructions, the court finds that a judgment of acquittal or a new trial is unwarranted based on the charge to the jury regarding an agreement under the Sherman Act. The defendants also contend that the court erred by refusing to give the following proposed jury instruction regarding the inability of a corporation to conspire with its own employees:

The first thing that is required for a conspiracy is at least two separate parties. This means that in order to find a conspiracy, you must find that at least one defendant agreed with one or more other parties including but not necessarily limited to the other defendants, to carry out the illegal acts that the government claims they carried out.

A corporation cannot conspire with its own officers or employees. Nor can a corporation's employees conspire among themselves. This is because a corporation, its officers and employees are so closely related that they are deemed to share a common purpose and are considered by the law to be one actor. And, (as I have told you,) a single actor cannot violate this part of the Sherman Act.

For similar reasons, a corporation cannot conspire with its wholly owned subsidiary. Like a corporation and its employees, a corporation and its wholly owned subsidiary share the same purpose and are, therefore, one actor under the law.

The final paragraph of this proposed instruction is unnecessary, as no evidence regarding subsidiaries was introduced at trial. *Velasquez*, 244 F.2d at 420. In fact, no evidence was introduced regarding an agreement or conspiracy between Suntar and its employees, or among Suntar employees. In any event, instruction 15 adequately covered the issue of the ability of a corporation to conspire with its employees. The instruction, set forth in its entirety above, states that "[a] conspiracy to allocate customers is an agreement or understanding *between competitors* not to compete for the business of a particular customer or customers." The employees of a corporation are not its competitors (at least they are not, given the evidence presented in this case).

■ The defendants further assert that the court wrongly instructed the jury on the issue of the effect of the conspiracy on interstate commerce. As discussed above, because the allocation of customers is a *per se* violation, proof of the conspiracy itself is sufficient to establish the requisite effect on interstate commerce. In any event, the court instructed the jury as to what constitutes interstate commerce, and the instruction, set forth below, was adequate:

An essential element of the offense prohibited by the Sherman Antitrust Act is that the defendants' alleged unreasonable restraint of trade must involve interstate commerce. The term "interstate commerce" includes transactions of commodities that are moving across state

lines or that are in the continuous flow of commerce from the commencement of their journey until their final destination in a different state. When such transactions are involved, the amount of commerce restrained by the conspiracy is of no significance.

The term "interstate commerce" may also include entirely intrastate transactions in which some or all of the defendants are not engaged in interstate commerce and some or all of the acts are wholly within a state, if the activities substantially and directly affect interstate commerce.

It is a question of fact for the jury to determine whether a particular defendant's conduct involves such interstate commerce in the light of business practices.

The defendants also challenge the court's instructions to the extent that those instructions state that a conspiracy to allocate customers is a *per se* violation of the Sherman Act. Because the defendants disagree not with the particulars of the court's instructions on this issue, but with the court's determination that a *per se* violation is alleged in the indictment, we address the defendants' arguments in part IV below.

## IV. *The Per Se Violation.*

At a hearing prior to trial, the court ruled that the indictment alleged a *per se* violation of the Sherman Act, and that the defendants would therefore be precluded from introducing evidence of reasonableness or justification at trial. The defendants assert that this ruling and the resulting instructions to the jury were incorrect. They rely primarily on *United States v. Coleman American Moving Services, Inc.,* Crim. No. 86–24–N (M.D.Ala. August 8, 1986). In that case, the district court outlined the standards for application of *per se* analysis and rule of reason analysis, and concluded that the indictment, which was characterized as alleging either price fixing or a group boycott, did not justify a pretrial ruling by the court that *per se* analysis should be used. In con-

trast, the indictment in the instant action was straightforward: it alleged a horizontal customer allocation agreement. Such an agreement is a *per se* violation of section 1. *See United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) ("[o]ne of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition"); *United States v. Cooperative Theatres of Ohio, Inc.,* 845 F.2d 1367, 1372 (6th Cir.1988) ("customer allocation ... is the type of 'naked restraint' which triggers application of the *per se* rule of illegality"); *United States v. Koppers Co.,* 652 F.2d 290, 293 (2d Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981). Therefore, at the pretrial hearing, we stated that assuming that the government would present evidence establishing the violation charged in the indictment, the defendants would be precluded from submitting evidence on reasonableness. At trial, the government did present such evidence, and thus, the defendants were precluded from presenting evidence on reasonableness and the court's instructions were based on *per se* analysis. In sum, our tentative pretrial ruling regarding the inadmissability of evidence of reasonableness, our refusal to allow presentation of evidence on reasonableness, our instructions to the jury based on *per se* analysis, and our refusal to give the defendants' instructions on reasonableness were correct.

## V. *The Rule 404(b) Similar Acts Evidence.*

The defendants contend that the court erred in ruling prior to trial that evidence of similar acts under Federal Rule of Evidence 404(b) was admissable, and in allowing such evidence to be presented at trial.

At trial, the government presented some evidence concerning similar customer allocation agreements entered into by the defendants before and during the time period charged in the indictment. The defendants assert that this evidence should have been excluded for two reasons: (1) the defendants' intent was not at issue because they

denied that they committed the acts charged in the indictment, and (2) the probative value of the evidence was far outweighed by its prejudicial effect.

 Similar acts evidence is admissable to prove knowledge, intent, or lack of mistake. Fed.R.Evid. 404(b). General intent is an essential element of a criminal antitrust violation. *United States v. United States Gypsum Co.*, 438 U.S. 422, 443–46, 98 S.Ct. 2864, 2876–78, 57 L.Ed.2d 854 (1978). The requisite intent can be proved by showing that the defendants knowingly joined and participated in the conspiracy. *United States v. Metropolitan Enterprises, Inc.*, 728 F.2d 444, 450 (10th Cir.1984). In the instant action, the issue of whether the defendants were involved in a conspiracy almost necessarily revolves around their intent. Certainly, intent was placed in issue during the trial. The defendants contended that although meetings may have taken place between competing roofers, no allocation agreement could result because of the general distrust among competitors in the roofing industry. Even in their post trial motions, the defendants Suntar and Pratt tacitly admit that intent was an issue at trial, stating that there was insufficient evidence of an agreement because "it was the intention of Suntar and Pratt to merely lead Michael Ronan and Fleenor to believe there was an agreement."

The defendants assert that even if intent is an issue, the similar acts evidence should not have been admitted because its probative value is far outweighed by its prejudicial effect. We disagree. The evidence was probative as to the defendants' intent, and it was not unduly prejudicial. The government's pretrial notice alerted the defendants as to the nature of the evidence the government presented, and the similar acts evidence was a minor portion of the government's case. Further, when during the trial similar acts evidence was introduced, the court instructed the jury that the evidence could be considered only for the limited purpose of proving knowledge, intent, or lack of mistake, and could only be considered with respect to the defendant(s)

against whom it was being admitted. Additionally, the court gave instruction 25, set forth below, at the close of the trial.

There has been evidence presented which relates to other possible unlawful acts and conduct of one or more of the defendants, other than the specific offense with which they are charged and are on trial. You are instructed that this evidence has been admitted only for the limited purpose of showing knowledge, intent, or lack of mistake, if any, of a particular defendant with respect to the offense charged. Such evidence of other unlawful acts of a like or similar nature may not be considered by you as proof that the particular defendant is guilty of the specific offense charged, but is relevant and may be considered by you only for the limited purposes I have just stated.

In sum, the Rule 404(b) evidence was properly admitted to establish the defendants' intent, knowledge, and lack of mistake. *See United States v. Mora*, 845 F.2d 233, 237 (10th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 562, 102 L.Ed.2d 587 (1988).

## VI. *The Conflict of Interest.*

 The defendants contend that the court erred in failing to require Suntar's counsel to withdraw. Prior to trial, the court held a hearing on the issue of a possible conflict of interest on the part of counsel for Suntar. Following the hearing, we issued an order declining to require counsel to withdraw. In that order, dated February 1, 1989, we incorrectly stated that the Model Code of Professional Responsibility, rather than the Model Rules of Professional Conduct, were applicable. Because of this error, we herein briefly re-analyze Suntar's arguments in light of the Model Rules.

Keaton is a part-owner of Suntar. Since the early 1980's, Suntar's counsel, Byron Neal Fox (Fox), has represented Keaton and Keaton Brothers Roofing and Siding, Inc., (Keaton Brothers) another company which Keaton partially owns. In July 1986, the government was informed that Fox and another lawyer would represent Keaton and Keaton Brothers in connection

with a grand jury investigation of the roofing industry in Kansas City, an investigation which gave rise to the instant case. In August 1986, Fox's co-counsel was notified that Keaton and Keaton Brothers were targets of the investigation.

On September 1, 1988, Ronald E. Partee (Partee), who at the time was counsel for Suntar and the defendant Pratt, met with attorneys for the government. At the meeting, the government attorneys inquired into a possible conflict of interest as a result of Partee's representation of both Suntar and Pratt. Additionally, the government attorneys inquired as to the office-sharing arrangement between Partee and Fox, the attorney for Keaton and Keaton Brothers. Further, the government informed Partee that the grand jury was continuing its investigation of Keaton's activities. Partee stated that he did not believe that a conflict existed, and that the office-sharing arrangement would not present a problem.

On September 21, 1988, the indictment against the defendants was handed down. The grand jury investigation continued. At the omnibus hearing on October 27, 1988, Fox entered his appearance on behalf of Suntar. On the same date, the grand jury testimony of Boxley, which included information about similar acts in which Keaton had participated, was supplied to Fox. On November 21, 1988, the government filed its voluntary bill of particulars, identifying Keaton as one of three unindicted coconspirators. The voluntary bill of particulars stated that "[a]t trial, the Government will introduce evidence of similar acts by defendants and coconspirators under Rule 404(b)." On January 17, 1989, the government filed its notice of the Rule 404(b) evidence which it sought to introduce at trial. The notice included similar acts evidence involving alleged antitrust conspiracies to which the defendants and Keaton were parties.

The defendants' response to the government's Rule 404(b) notice argued that presentation of similar acts evidence would give rise to a conflict of interest because of Fox's representation of Suntar and Keaton.

Thus, they asserted that the 404(b) evidence should not be admitted, or that the court should grant a continuance so that Suntar could obtain different counsel. The defendants' response included the following, rather obscure statement:

The Government now raises for the first time in their Motion some twenty (20) days before trial facts which would cause a disqualification of counsel. In an effort to circumvent this problem, Byron Neal Fox has contacted Mr. Thomas Keaton about a waiver and Mr Keaton has informed Mr. Fox that he would *not* agree to waive his attorney client privilege. Should this HONORABLE COURT permit the Government to introduce into this trial these ten (10) other conspiracies, there must also be some action on this problem.

The court held a hearing on the issue, at which the defendants asserted that if the Rule 404(b) evidence was admitted, Fox's continued representation of Suntar would violate Rules 1.7 and 1.9 because of the divergent interests of Suntar and Keaton. However, the defendants failed to enlighten the court as to the nature of the alleged conflict of interests between Suntar and Keaton. Further, when questioned by the court on the issue, Fox admitted that the conflict was present, or not present, as a result of the government's case in chief; that is, the conflict issue was present whether or not the government was allowed to present its Rule 404(b) similar acts evidence.

The defendants continue to assert in their post-trial briefs that because of Rules 1.7 and 1.9, the court should have required Fox to withdraw and granted a continuance. Rule 1.7 states that generally, a lawyer shall not represent a client if the representation of that client will be directly adverse to another client. Rule 1.9 states that generally, if a lawyer has formerly represented a client, he shall not represent another party in a substantially related matter in which that party's interests are materially adverse to the interests of the former client.

However, following the hearing, and even having had the benefit of the evidence at trial and the post-trial briefs, the court remains unclear as to the basis of the asserted conflict. The defendants assert that the court's ruling caused Fox to "choose between vigorously defending Suntar with all the knowledge at his disposal, or utilize facts which he was privy to only because of his status as counsel for Keaton." However, the evidence at trial indicated that the interests of Keaton and Suntar were parallel, as Keaton was the part-owner of Suntar. The court still has not been informed as to any manner in which the interests of Suntar are directly or materially adverse to those of Keaton.

Additionally, our earlier order was based in large part on the fact that the defendants and their counsel should have been aware of any possible conflicts long before they raised the issue on the eve of trial. As we stated:

> Without doubt, they should have been alerted to the problems on November 21, [1988], the date of the government's voluntary bill of particulars which stated that (1) Tom Keaton was an unindicted coconspirator, and (2) at trial the government would offer evidence of similar acts by the defendants and the unindicted coconspirators.

> We are not convinced that an actual conflict arises from Fox's posture, and we will not direct him to withdraw. We are convinced that if a conflict does exist, it was discoverable long before the government filed its notice regarding Rule 404(b) evidence. Any hardship created by the resolution of this issue at this late date is the direct result of the failure of the defendants and their counsel to recognize or alert the court to this issue earlier. It is the responsibility of Suntar and Fox to take any actions necessary to resolve or mitigate any problems created by their actions or inactions to date, and to insure that Suntar is prepared to proceed to trial with adequate representation on February 6, 1989.

Frankly, the court was wary that the conflict issue was raised simply in the hope that the court would agree that a conflict existed arose because of the Rule 404(b) evidence and would preclude the government's presentation of the evidence, rather than delay the trial because of the conflict. Having been given no specifics as to the allegedly conflicting interests of Suntar and Keaton, we believe that our suspicions were justified. In any event, we are not inclined to grant a judgment of acquittal or a new trial on the basis of a cryptic, unsupported allegation of a conflict.

VII. *The Court's Various Rulings.*

The defendants assert that the court erred in various rulings before and during trial, but they decline to specifically enumerate the rulings. We decline to grant a judgment of acquittal or a new trial based on these unspecified allegations of error.

IT IS THEREFORE ORDERED that the defendants' motion for a judgment of acquittal or a new trial is denied.